BAKER ET AL. *v.* COCA COLA BOTTLING WORKS, ETC.

[No. 19,296. Filed October 25, 1961.]

*Benedict R. Danko, Green, Powers, Belshaw & Danko,* of Whiting, *J. Patrick Smith,* and *Smith & Smith,* of counsel, of LaPorte, for appellants.

*Albert Gavit, Sr., Fred F. Eichhorn, Sr., Gavit & Eichhorn,* of Gary, and *Frederick Link,* of LaPorte, for appellee.

COOPER, J.—The appellants brought this action to collect damages from appellee in two paragraphs, one paragraph being for alleged personal injuries and the second to recover damages incurred in the payment of medical expenses as the result of the personal injuries.

It appears from the record that at the conclusion of appellants' evidence, appellee moved for a peremptory verdict in their favor. The trial court sustained the motion, the requested peremptory instruction was given and the verdict was so-returned. A final judgment was rendered in favor of appellee.

Within the time allowed, appellants filed their motion for a new trial charging the trial court erred in sustaining the motion for a directed verdict for defendant, appellee, and also erred in giving a written instruction directing a verdict for the defendant-appellee, and that the verdict of the jury is not sustained by sufficient evidence and is contrary to law. Thereafter, the trial court denied said motion for new trial. The error assigned before us is the overruling of the appellants' motion for new trial.

It is also apparent from the following pertinent first eight paragraphs of the appellants' amended complaint they were pleading and attempting to establish negligence under the doctrine of "res ipsa loquitur":

"1. That the defendant is a corporation incorporated under the laws of the State of Indiana, with its principal office located at Gary, Indiana;

"2. That on or about the 2nd day of July, 1951, the defendant was a manufacturer of and a dealer in soda pop beverages, including a certain cola drink advertised and sold under the trade name of Coca Cola;

"3. That on or about the aforementioned date, the plaintiff, Hermina Baker, purchased a carton of said cola from Sandy's I.G.A. Store, Lauerman's Road, Cedar Lake, Indiana, a retailer of said beverage, the said carton consisting of six (6) six-(6) ounce bottles of said cola, which bottles were set in a cardboard container furnished by the defendant for the purpose of convenience and comfort in handling of the same;

"4. That previous to the purchase of the said cola by the plaintiff, Hermina Baker, the said beverage was delievered to the said retailer by the said defendant, and was not handled or moved at any time by the said retailer or anyone except in the exercise of due care;

"5. That at the time the plaintiff, Hermina Baker, picked up the said carton of cola to purchase the same, the said carton of cola was setting in an upright position on the floor of the said retailer's store in a location where no abnormal atmospheric temperature existed at the said time and on the said day;

"6. That upon purchase of the said cola, the said plaintiff, Hermina Baker, held the said carton at her right side and proceeded on foot to take the same to her home, but as she proceeded in the direction of her home, one of said bottles of said cola exploded, injuring and shocking this plaintiff, and causing her to become frightened and fall to the ground;

"7. That the plaintiff, Hermina Baker, was in the exercise of due care and caution in her actions at all times mentioned herein;

"8. That the explosion of the said bottle of the said cola was the result of negligence on the part of the defendant in the manufacturing, bottling or handling of the said cola, the exact and specific negligence being unkown to the plaintiffs, but better known, or capable of being known, to the defendant; . . ."

The appellants contend in this appeal that: "I. From an examination of the appellants' evidence, facts and all reasonable inferences to be drawn therefrom, a *prima facie* case is established under the *res ipsa loquitur* rule. II. From an examination of the law, the weight of authority supports the appellants' position under the *res ipsa loquitur* rule."

Therefore, the crux of the principal questions presented to us by this appeal is whether the doctrine of *res ipsa loquitur* is applicable in this case under the evidence introduced by the appellants.

Generally, it is the law that the mere fact of an injury will not give rise to a presumption of negligence on the part of anyone, under the doctrine of *res ipsa loquitur,* an expression which means, literally, the thing speaks for itself, the facts or circumstances accompanying an injury may be such as to raise a presumption, or at least permit an inference, of negligence on the part of the defendant.

It appears the doctrine is a qualified exception to the general rule that the mere fact of injury will not create an inference of negligence. We find the following statement in §295, Negligence, 38 Am. Jur., p. 989:

". . . The conclusion to be drawn from the cases as to what constitutes the rule of res ipsa loquitur

is that proof that the thing which caused injury to the plaintiff was under the control and management of the defendant, and that the occurrence was such as in the ordinary course of things would not happen if those who had its control and management used proper care, affords sufficient evidence, or, as sometimes stated by the courts, reasonable evidence, in absence of explanation by the defendant, that the injury arose from or was caused by the defendant's want of care."

See also: *Union Traction Co.* v. *Berry, Admr.* (1919), 188 Ind. 514, 121 N. E. 655, 124 N. E. 737, 32 A. L. R. 1171; *City of Decatur* v. *Eady* (1917), 186 Ind. 205, 115 N. E. 577, L. R. A. 1917E 242; *Cleveland, etc., R. Co.* v. *Hadley* (1907), 170 Ind. 204, 82 N. E. 1025, 84 N. E. 13, 16 L. R. A. (NS) 527, 16 Ann. Cas. 1.

It seems the doctrine does not apply where there is direct evidence as to the precise cause of the injury and all the facts and circumstances attending upon the occurrence appear. See 38 Am. Jur., p. 992, §296.

It is true in a proper res ipsa case, proof of the occurrence and attendant circumstances, permits an inference of defendant's negligence which, though rebuttable, cannot be disregarded by the triers of fact, but must be weighed against the evidence adduced by the defendant.

Usually the doctrine is inapplicable unless the control or right (and duty) of control of the instrumentality causing the injury is in defendant *at the time of the injury, although some cases hold that it is sufficient to prove that the instrumentality was in the possession and control of the defendant at the time the negligent act was committed, together with further proof of the absence of any cause intervening*

*between the negligent act and the injury.* See 65 C. J. S. Negligence, Sec. 220 (8) bb, p. 1014; 4 A. L. R. 2d 466.

In Indiana, we follow the foregoing theory. In the recent case of *New York, Chi., etc. R. R. Co.* v. *Henderson* (1957), 237 Ind. 456, at pp. 462, 463, the following statement was made by Judge Arterburn:

> "Negligence, as any other fact or condition, may be proved by circumstantial evidence, and it has been urged that there is nothing distinctive about the doctrine of *res ipsa loquitur*, since it involves merely the permissible drawing of an inference of negligence from certain surrounding facts. This no doubt is true except that the law permits the inference of negligence to be drawn under certain sets of facts known as *res ipsa loquitur*. The basis or reasoning for this principle, in its origin at least, seemed to have been that the defendant had exclusive control over the injuring agency and the plaintiff normally had no excess to any information about its control and operation. 3 Cooley on Torts (4th Ed.), Sec. 480, p. 369.
>
> "Frequently it is said the doctrine is applicable and negligence may be inferred 'where the thing (injuring instrumentality) is shown to be under the management of the defendant or his servants and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care.' *Scott* v. *London & St. Katherine Docks Co.* (1865), 3 H. & C. 596, p. 601; 159 Eng. Rep. 665, p. 667."

Judge Emmert, in his concurring opinion in the case of *New York, Chi., etc. R. R. Co.* v. *Henderson, supra,* at pp. 478, 479, stated:

> "The Indiana cases on *res ipsa loquitur* generally support the definition given in *Pittsburgh, etc. R. Co.* v. *Arnott, Admx.* (1920), 189 Ind. 350, 368, 126 N. E. 13, which is as follows:
>
> " '*It is well settled that, when the instrumentalities which produce an accident are under the exclusive charge of the defendant or his servants,* and when the accident is such as does not occur in

the ordinary course of events if those in charge use proper care, proof of the accident is sufficient to create a *prima facie* case of negligence, which will prevail unless it is met by evidence to show that the accident could not have been avoided by due care on the part of the defendant.'

"See *Prest-O-Lite Co.* v. *Skeel* (1914), 182 Ind. 593, 599, 600, 106 N. E. 365; *Wass* v. *Suter* (1949), 119 Ind. App. 655, 659, 84 N. E. 2d 734.

"It is a rule of evidence. *Fleming* v. *Pyramid Coal Corp.* (1951), 122 Ind. App. 41, 44, 100 N. E. 2d 835; *Wass* v. *Suter* (1949), 119 Ind. App. 655, 84 N. E. 2d 734, *supra*. It does not dispense with the rule that he who alleges negligence must prove it by a fair preponderance of the evidence. *Kickels* v. *Fein* (1937), 104 Ind. App. 606, 615, 10 N. E. 2d 297; 65 C. J. S. 993, 994, §220(3). It does not create a *prima facie* presumption of negligence." (Our emphasis)

Judge Bobbitt stated further in his dissenting opinion in the case of *New York, Chi. etc., R. R. Co.* v. *Henderson, supra*:

"It is also well settled in Indiana that in order for the doctrine to apply *it must be made to appear that all instrumentalities causing the accident were under the exclusive control and management of the defendant. Worster* v. *Caylor, supra* (1953), 231 Ind. 625, 110 N. E. 2d 337; *Indiana Harbor Belt R. Co.* v. *Jones* (1942), 220 Ind. 139, 148, 41 N. E. 2d 361; *Pittsburgh, etc. R. Co.* v. *Arnott, Admx.* (1920), 189 Ind. 350, 368, 126 N. E. 13; *Prest-O-Lite Co.* v. *Skeel* (1914), 182 Ind. 593, 599, 106 N. E. 365, Ann. Cases 1917A, 474; *Wass* v. *Suter, supra* (1950), 119 Ind. App. 655, 84 N. E. 2d 734; *Kickels* v. *Fein* (1938), 104 Ind. App. 606, 617, 10 N. E. 2d 297; *Pittsburgh, etc. R. Co.* v. *Hoffman* (1914), 57 Ind. App. 431, 442, 107 N. E. 315; *Hook* v. *National Brick Co.* (1945), 7 Cir., 150 F. 2d 184." (Our emphasis)

We also find the following statement of Judge Bobbitt's dissenting opinion in the case of *New York, Chi.,*

etc. R. R. Co. v. *Henderson, supra,* at pp. 486, 487, wherein he quoted our definition of res ipsa loquitur, as stated in the case of *Wass* v. *Suter* (1949) (T. D. 1950), 119 Ind. App. 655, at 659:

" 'This doctrine has been generally defined to mean that *when the thing which caused the injury to the plaintiff was under the control and management of the defendant or his servants,* and the occurrence was such that in the ordinary course of things would not happen if those who had its control and management use proper care, that this affords reasonable evidence, in the absence of explanation by the defendant, that the injury arose from or was caused by the defendant's want of care; that under such circumstances there is a prima facie case of negligence.' Citing authorities." (Our emphasis)

While we dislike setting forth evidence verbatim in opinions, we feel that it is necessary in this particular case in order to point out the omissions which we feel were fatal to the appellants' cause of action.

Reviewing the pertinent evidence before us under the foregoing statements of law, we find the only evidence connecting the appellee with the alleged accident in the record is as follows:

"A. My father-in-law and I operated what was known as Sandy's Super Market, Cedar Lake.

"Q. Did you and your father-in-law operate the store known as Sandy's Super Market on or about the 2nd day of July, 1951?

"A. Yes, sir.

"Q. Where was the business located, what were the names of the streets running alongside?

"A. Grove and Lauerman.

"Q. Two roads, cross roads?

"A. Yes, sir; the store was on the corner.

"Q. Would you explain to the court, and jury, Mr. Sandquist, what type super market this was you operated?

"A. It was a grocery, market, self-service market; we had the store divided, three aisles down where there are groceries; shelves along the walls, storage in the basement; meat market in the back; three room apartment in the rear, my father-in-law and his wife live there.

"Q. Did you sell carbonated beverages in this store?

"A. Yes, sir.

"Q. What kind of beverages did you sell?

"A. All kinds. Pepsi, Nehi, Coke, 7-Up, Canfield's.

"Q. You sold Coca Cola there?

"A. Yes, sir.

"Q. What is Coca Cola, if you know?

"A. A carbonated beverage, I believe.

"Q. From whom did you *buy* the carbonated beverage known as Coca Cola you had in your store?" (Our emphasis)

"A. Coca Cola Bottling Works, Gary, I believe.

"Q. Did I understand you to say the Coca Cola Bottling Works of Gary, is that right?

"A. Yes, sir.

"Q. What type containers did the Coca Cola come in?

"A. In cartons and in wooden cases, we sold it both ways.

"Q. Some in cardboard containers, is that the customary six pack referred to, six, six ounce bottles?

"A. I believe/

"Q. How did the Coca Cola get to your store?

"A. On truck.

"Q. Delivered there, was it?

"A. Yes, sir.

"Q. How often did the Coca Cola delivery truck make deliveries to your store?

"A. Once a week.

"Q. When the Coca Cola was delivered to your store explain if you will, in your own words to the court, and jury, how it was delivered?

"A. Well, our coke has cases, all the coke is brought in the store basement, there was two entrances to the basement and we had a platform which was covered for trucks to pull up alongside, they set the cases off on the platform, then they were carried one or two at a time as the driver would downstairs and stack them in the basement, or they would park the truck near the rear of the store and by means of a hand truck, one with two wheels, they would stack, oh, five cases I believe carry all of them, wheel them around the back of the store down three stairs into the basement, then wheel it over to their spot, just set them there, that's it. Then you take out the empties too, one drive in, one drive out.

"Q. The coca cola delivery man would store the coca cola in the basement, is that correct?

"A. Yes, sir.

"Q. Did you at any time handle the coca cola to this point?

"A. No.

"Q. When is the first time you handled the coca cola after the coca cola truck and delivery man had handled it?

"A. To bring it out of the basement to be put up in the store to be sold, purchased by customers.

"Q. In other words, you would go down in the basement, pick it up and bring it up in the store, is that correct?

"A. Yes, sir.

"Q. How many cartons did you generally keep upstairs in the store?

"A. About three cases, that would be twelve cartons.

"Q. Who would bring the coca cola upstairs?

"A. Either myself or the stock boy we had at the time, Carl Ludvigson.

"Q. How old was Carl Ludvigson at the time, if you know?

"A. I believe about fifteen.

"Q. Did you ever pick up any carbonated beverages to bring up into the store?

"A. Yes.

"Q. When would you do this?

"A. When, did you say?

"Q. Would you do this when Carl was along?

"A. No, if Carl was there that usually was his job; in his absence I would bring some up if needed.

"Q. Did anyone beside yourself and Carl Ludvigson ever bring up any coca cola from the basement?

"A. No, sir.

"Q. Now, Mr. Sandquist, did you ever have an opportunity to observe Carl Ludvigson handle carbonated beverage, coca cola?

"MR. LINK: Just a minute. The court please we are interested in one particular case of coca cola, what he did dozens of times is not material.

"THE COURT: The objection is overruled.

"A. Yes, sir, I did.

"Q. Now, please tell the court, and jury, Mr. Sandquist, what you observed when you saw Carl Ludvigson handle Coca Cola.

"MR. LINK: Object to that question on these grounds—not fixed as to time, either before or after.

"THE COURT: Objection sustained.

"Q. Did you ever see Carl Ludvigson mishandle, mistreat any carton of Coca Cola at any time?

"MR. LINK: Object to that question.

"THE COURT: The objection is sustained.

"MR. DANKO: Your honor, I wish to be heard on that point, if they wish, out of the presence of the jury.

"THE COURT: The court doesn't want to hear argument on it, Mr. Danko. The objection is sustained.

"Q. I will rephrase it. Mr. Sandquist, to your knowledge has Carl Ludvigson ever broken a bottle of any sort of beverage in your store?

"MR. LINK: Object, first of all, not fixed as to the time.

"THE COURT: The objection is sustained.

"Q. Has he ever broken a bottle of soda pop beverage, Mr. Ludvigson, at any time?

"MR. LINK: Object to that question.

"THE COURT: The objection is sustained.

"MR. DANKO: Your honor, we are trying to show

"THE COURT: The objection is sustained Mr. Danko.

"Q. Mr. Sandquist, was there any difference in temperature between the downstairs basement and the upstairs of your store?

"MR. LINK: Object to the question unless he fixes the time.

"THE COURT: Objection sustained.

"Q. On or about the 2nd day of July, 1951, Mr. Sandquist, was there any difference between the temperature in the basement of your store and the temperature in the upstairs of your store?

"A. To the best of my knowledge it would vary very slightly, a few degrees.

"Q. Very slightly, a few degrees?

"A. Yes, sir.

"Q. Now, Mr. Sandquist, on or about the 2nd day of July, 1951, to your knowledge, did you see Carl Ludvigson mishandle, or mistreat, any soda pop beverage?

"MR. EICHHORN: Just a minute, we are not concerned with any

"THE COURT: State your objection, Mr. Eichhorn.

"MR. EICHHORN: My objection is this, it covers any beverage that may have been handled.

"THE COURT: The objection is sustained.

"Q. Did you on or about the 2nd day of July, 1951, see Carl Ludvigson mishandle or mistreat any carton of coca cola?

"A. No, sir, I didn't see it.

"Q. Did you on or about the 2nd day of July, 1951, mishandle, or mistreat, any carton of coca cola?

"MR. LINK: Your honor please, we object to the question because it calls for a conclusion?

"THE COURT: The objection is sustained.

"Q. Now, Mr. Sandquist, where were the cartons of coca cola placed by him when they were brought upstairs in your store?

"MR. LINK: Object to that unless the time is fixed.

"THE COURT: The objection is sustained.

"Q. Going back—incidentally, for the record, all of the testimony goes back on or about the 2nd day of July, 1951—where were the cartons of coca cola placed by him when he brought them upstairs in your store from the basement?

"A. Under the center aisle shelves, under the shelves.

"Q. Center aisle of this store?

"A. Yes.

"Q. They would be placed under the shelves in the center aisle?

"A. Yes, straight down from each shelf so they could be observed as you walked along.

"Q. Where, with relation to the floor, were they set at the time?

"A. On the floor.

"Q. They were sitting on the floor under the shelves, is that correct?

"A. Yes, sir.

"Q. Were all carbonated beverages sitting on the floor under those shelves?

"A. Yes, sir.

"Q. Were the carbonated beverages, including the coca cola on or about that day, the 2nd day of July, 1951, were they in a position where the rays of the sun would reach them?

"A. No, sir.

"Q. What, if any, difference, Mr. Sandquist, was there between the store temperature on that day and the outdoors?

"MR. LINK: Your honor, please, I object to that question, calls for comparison.

"THE COURT: If that is the basis for your objection it is overruled.

"MR. LINK: Also calls for a conclusion.

"THE COURT: Objection overruled. You may answer. Read the question.

"MR. DANKO: I will withdraw the question.

"Q. Mr. Sandquist, was your store air conditioned?

"A. No, sir.

"Q. You had no cooling devise in the store at all on that day, did you?

"A. No, sir.

"Q. Do you know the plaintiff, Hermina Baker, in this case?

"A. Yes, sir.

"Q. Was she a customer in your store on or about the 2nd day of July, 1951?

"A. Yes, sir.

"Q. Had she been a regular customer before this time?

"A. Yes, sir.

"Q. For how long would you say Mr. Sandquist?

"A. The best I remember, a couple of years she had been a regular customer.

"Q. At least she was a customer before this time?

"A. Oh, yes, sir.

"Q. Now, calling your attention to on or about the second day of July, 1951, I will ask you what, if anything, happened that day involving Mrs. Baker?

"MR. LINK: Your honor, please, we object to the question, because it is too general.

"THE COURT: I think perhaps it is, but I will permit him to answer, testify, if you wish to object as he proceeds you may make your objection. You may answer Mr. Witness.

"MR. EICHHORN: If he knows of his own knowledge.

"THE COURT: Testify what you say, heard, nothing else.

"Q. Involving Mrs. Baker.

"A. On that date?

"Q. Yes.

"A. Mrs. Baker done some shopping in our store, bought some groceries and a carton of coca cola, how I remember I was the one who checked her out that particular day.

"Q. She bought groceries in your store on that day?

"A. Yes.

"Q. Did she buy a carton of coca cola?

"A. Yes, sir.

"Q. Where was the carton of coca cola she bought at the time she picked it up?

"A. Under the aisle, under the shelves on the floor as I stated before.

"Q. How many bottles did the carton contain, Mr. Sandquist?

"A. Six.

"Q. Now, after Mrs. Baker picked up the carton of coca cola what did she do then, if anything?

"A. Brought that along with the groceries to the counter to be checked out.

"Q. To the check-out counter?

"A. Yes.

"Q. Did you observe her handle the carton of coca cola.

"A. Well I was observing any customer walking.

"Q. You saw her didn't you?

"A. Yes.

"Q. Did you observe her mishandle or mistreat the carton of coca cola?

"MR. LINK: Object to that.

"THE COURT: Objection sustained.

"Q. Did you observe how she handled this carton of coca cola on that day? Did you see her handle it?

"A. To the extent she brought it to the counter and placed it on the counter.

"Q. Will you tell the court, and jury, how she handled it?

"A. As I understand, she just picked it up from the floor and placed it on the check-out counter.

"Q. Now, after you checked her out, Mr. Sandquist, what happened then, if you know?

"A. She left our store and went home."

.  .  .  .  .

"Q. Did you sell carbonated soda pop in that store?

"A. Yes, sir.

"Q. Did they sell any coca cola?

"A. Yes, sir.

"From whom did they buy the coca cola?

"MR. EICHHORN: Just a minute. They haven't shown the witness had anything to do with purchasing.

"THE COURT: You may answer, if you know.

"Q. From whom did they buy coca cola in the store, if you know?

"A. Coca Cola Bottling Company.

"Q. What type of containers was it placed in?

"A. Cardboard containers.

"Q. Would you describe that the best you can to the jury?

"A. Well, it was a cardboard container with three holes on each side with a partition in the middle, served as a handle, with six bottles of coca cola in one carton.

"Q. How did the coca cola get to the store there, Mr. Ludvigson?

"A. By truck.

"Q. By whose truck?

"A. Coca Cola Bottling Company.

"Q. They delivered coca cola to the store, is that correct?

"A. Right.

"Q. Were you present whenever any deliveries were made by the Coca Cola Bottling Company?

"A. Yes, sir, I was.

"Q. Would you please explain to the court, and jury, how this was done?

"MR. LINK: Your honor, please, we object unless he fixed the time about which he is testifying.

"MR. DANKO: Withdraw the question.

"Q. During the week immediately preceding the 2nd of July, 1951, were you in the store when the coca cola delivery man delivered coca cola to the store?

"A. No, sir, I wasn't.

"Q. What day, if you know, did the coca cola company customarily deliver coca cola?

"MR. LINK: Object to that, customarily, wouldn't make any difference here.

"THE COURT: Objection is overruled.

"Q. Did the Coca Cola Bottling Company have a certain day they delivered coca cola?

"A. I believe he did, I don't know the day.

"Q. Did you observe the coca cola delivery man deliver coca cola during this period of time near, approximately July 2nd?

"MR. LINK: Your honor, please, object to the question, he asked if he had seen him a week preceding and he said no.

"THE COURT: Read the question. (Question read)

"THE COURT: Objection overruled.

"A. I would say I saw him approximately a week before.

"Q. Would you please tell the court, and jury, what you observed?

"A. Well, the coca cola truck pulled up to the store, parked along the east side of the store, the coke man loaded the cases of coca cola on the little two wheel hand truck pushed them to the back of the store at which there was two steps he went down and wheeled it into the basement.

"Q. Where in the basement would he take that, if you know?

"A. It would be approximately thirty to thirty-five feet from the door.

"Q. Then he would set them where in the basement?

"A. He would set them in the center aisle, on the floor.

"Q. Were there any empty bottles in that area at that time?

"A. Well, we kept the empty bottles separate from the full bottles.

"Q. What, if anything, did you do with reference to the empty bottles?

"A. When he brought full bottles in he picked up the empty cartons, loaded them on the truck and delivered them to the truck.

"Q. Did you at any time handle the coca cola up to this point?

"A. Up to the point he brought it, no, sir, I did not.

"Q. Did anyone else, to your knowledge, handle the coca cola up to the point he stored it in the basement?

"A. No, sir.

"Q. When is the first time you would handle the coca cola after the coca cola delivery truck delivery man handled it.

"MR. LINK: Object to that.

"THE COURT: Objection is sustained.

"Q. Calling your attention to on or about the 2nd day of July, 1951, and after this delivery which you testified you observed approximately a week before, when would be the first time you handled the coca cola after the coca cola delivery truck and delivery man placed it in the basement?

"MR. LINK: The question is objectionable, not when would he, when did he, if he knows.

"MR. DANKO: I will rephrase the question.

"Q. When did you first handle it?

"A. I would say within a day.

"Q. Were you going to school during that period of time, Mr. Ludvigson?

"A. I was out for summer vacation.

"Q. Were you working full time in the store when you were on vacation?

"A. Yes, sir.

"Q. What were your duties in the store, Mr. Ludvigson?

"A. I was stock boy, carry-out boy, general clean-up boy and took care of all empty pop bottles, things like that.

"Q. In these duties as stock-boy you testified you handled beverages, is that correct?

"A. Yes, sir.

"Q. In those duties as stock-boy in handling beverages, would you handle coca cola?

"A. Yes, sir.

"Q. How many cartons of coca cola did you generally keep upstairs in the store, Mr. Ludvigson?

"MR EICHHORN: I believe that is objectionable again, unless he fixes the time he is talking about.

"MR. DANKO: I am speaking, your honor, generally on or about the 2nd day of July, 1951, that's the period in which we are interested, Mr. Ludvigson, during that period of time, how many cartons were generally kept upstairs in the store?

"A. Twelve cartons.

"Q. Who would bring the coca cola from the basement to the upstairs store during that period of time?

"A. I would.

"Q. Now, calling your attention specifically to the 2nd day of July, 1958, did you bring up any coca cola from the basement to the store on that day?

"A. In 1958?

"Q. Fifty-one, I am sorry, withdraw the question. Calling your attention to the specific date of July 2nd, 1951, did you bring up any coca cola from the basement to the store on that date?

"A. Yes, sir.

"Q. Do you know what day that was?

"A. It was on Monday, sir.

"Q. Calling your attention to on or about the 30th day of June, the Saturday immediately preceding the 2nd day of July, did you bring up any coca cola from the basement to the store on that day?

"A. Yes, sir.

"Q. What time during the day would you bring up the coca cola?

"A. It would be in the morning on Monday; on Saturday it would be in the morning and evening.

"Q. In other words you would bring up coca cola at two different periods, or times, on Saturday, is that correct?

"A. Right, sir.

"Q. Do you recall when on July 2nd, 1951, you brought up the coca cola, whether it was in the morning, or afternoon?

"A. It was in the morning, sir.

"Q. Who brought up the coca cola during the entire week commencing with June 25th, which is Monday, of 1951, if you know?

"A. I did, sir.

"Q. Was that one of your duties as stock boy in this store?

"A. Yes, sir, it was.

"Q. Now, would you please tell the court and jury, Mr. Ludvigson, the manner in which you would bring up the coca cola from the basement to the store?"

It appears from the pertinent evidence which we have heretofore set out verbatim that there is an absolute lack of any evidence of probative value upon which an inference of negligence could be based because of the failure to show that the alleged instrumentality was *manufactured* or *bottled* by the appellee herein as averred by the appellants in their complaint; nor do we find any evidence whatsoever that the alleged injuring instrumentality was under the management

and/or control of the appellees, or his servants, as required by the doctrine under the authorities we have heretofore set out.

In reviewing the evidence in the record before us and bearing in mind the general rule of law as stated by our Supreme Court in the case of *Worster* v. *Caylor* (1953), 231 Ind. 625, at 628, 110 N. E. 2d 237, that under the doctrine of res ipsa loquitur:

> "There is no question that the burden of proving that the defendants or one of them were or was guilty of the negligence charged, rests upon the plaintiff. . . .
>
> "A peremptory instruction may be given when there is an absence of evidence to establish one or more of the elements essential to plaintiff's right to recover. *Purcell* v. *English* (1882), 86 Ind. 34, 35; *Washer* v. *The Allensville, Center Square and Vevay Turnpike Company* (1881), 81 Ind. 78, 86; *Dodge* v. *Gaylord et al.* (1876), 53 Ind. 365, 377; *Wolfe* v. *The Evansville and Terre Haute Railroad Company* (1894), 136 Ind. 383, 36 N. E. 213; *Day* v. *Cleveland, Columbus, Cincinnati and St. Louis Railway Co.* (1894), 137 Ind. 206, 210, 36 N. E. 854; *Cunningham, Admr.* v. *New York Cent. R. Co.* (1943), 114 Ind. App. 90, 101, 48 N. E. 2d 176."

Under the appellants' averments it was incumbent upon them to establish that the appellee manufactured or bottled the alleged instrumentality and that the injuring instrumentality was under the management and control of the appellee, or his servant, which were essential elements to the appellants' right to recover under the doctrine of res ipsa loquitur.

When the motion for a directed verdict was made, it became the duty of the trial judge to determine whether there was some evidence of probative value to support the appellants' charge of negligence under the doctrine of res ipsa loquitur. The trial

judge determined that there was no such evidence and sustained the motion for a directed verdict. Under the evidence in the record before us and the applicable law, we find no error.

The judgment of the trial court is therefore affirmed. Ax, J., Myers, J., Ryan, P. J., concur.

NOTE.—Reported in 177 N. E. 2d 759.