**BITUMINOUS FIRE & MARINE INSURANCE CO. and Don Chance Construction Management, Plaintiffs-Appellants,**

v.

**CULLIGAN FYRPROTEXION, INC., Defendant-Appellee.**

**No. 1–1180A333.**

Court of Appeals of Indiana, First District.

July 28, 1982.

**2.** *Also see: Prudential Ins. Co. of America v. Dismore* (1935), 261 Ky. 741, 88 S.W.2d 924; *Couch on Insurance 2d* (1966) § 53:84.

James L. Crawford, Sacopulos, Crawford & Johnson, Terre Haute, for plaintiffs-appellants.

Richard R. McDowell, Hill, Fulwider & McDowell, P. C., Indianapolis, for defendant-appellee.

NEAL, Judge.

Bituminous Fire & Marine Insurance Co. (Bituminous) and Don Chance Construction Management (Chance) appeal adverse judgments in the Vigo Superior Court, Division 2, in their suit for damages against Culligan Fyrprotexion, Inc. (Culligan). The procedural history of the case is as follows: Bituminous, a subrogee of Chance for money paid to Chance on its insurance contract for water damage, initiated this suit to recover the amount of its payment, incidental expenses, attorney fees, and punitive damages. It proceeded against Culligan, a subcontractor of Chance, on the multiple theories of (1) breach of contract, (9) negligence, (3) *res ipsa loquitur*, and (4) implied warranty. Chance intervened, but the trial court granted Culligan's motion to dismiss Chance's complaint because he was not the real party in interest, having been paid in full, and having assigned all his rights to Bituminous. Prior to trial, the court further granted Culligan's motion for summary judgment on issues of attorney fees, punitive damages, and incidental expenses, thereby limiting Bituminous' possible recovery to the amount actually paid Chance. Trial was had by jury, and at the close of all of the evidence the trial court further withdrew issue (1) breach of contract and issue (3) *res ipsa loquitur* from the jury. The jury verdict was in favor of Culligan on the remaining issues. Although this is not clear, it appears that Chance's sole issue on appeal is alleged error in dismissing his intervenor's complaint. Bituminous principally challenges the court's decision to withdraw issues (1) and (3) from the jury, and grant summary judgment on the issues of punitive damages, attorney fees, and incidental expenses.

We reverse in part and affirm in part.

## STATEMENT OF THE FACTS

Chance was the general contractor for the construction of an addition to the Canterbury Convalescent Center in Terre Haute, Indiana. On September 9, 1975, Culligan subcontracted with Chance to install a "dry pipe" system of automatic sprinklers for fire protection in the Center. In accordance with the contract, Culligan designed and installed the system according to plans which had received the prior approval of Chance, the State Fire Marshal, and the Indiana Rating Bureau. Culligan furnished all labor and material for the system. The construction involved running pipes horizontally above the ceiling in the attic; sprinkler heads were then suspended from "T" fittings in the pipes. The sprinkler heads came through the ceiling and hung below it. Air pressure of 30 to 40 pounds per square inch was maintained by a compressor in the pipes. The system was designed so that if a fire occurs and the temperature rises sufficiently, the sprinkler heads melt, the air escapes, the drop of pressure trips the system, and water enters the system under pressure and is sprayed on surrounding surfaces. The water flow in turn triggers an alarm. A "dry pipe" system can be used even in freezing temperatures.

The installation of the sprinkler system was commenced as soon as the building was framed and enclosed from the weather. The system was substantially finished before the interior was completed and before the ceiling was installed. After the ceiling was in place, the sprinkler heads were installed. Other mechanical contractors, such as heating, plumbing, electrical, and air conditioning, performed their work at approximately the same time and place as Culligan's sprinkler contract was being performed. These other contractors were substantially finished in the attic by the time the sprinkler system was complete. The only major job remaining after Culligan had completed its work was that of blowing insulation into the attic with a hose, a job which required the presence of a man in the attic. Other contractors may have done some minor things in the attic after that time. After the ceiling was installed, the attic was accessible only through a folding staircase in the ceiling. After completion, the system was tested for leaks or other malfunction under 200 pounds of pressure per square inch for two hours in the pres-

ence of Chance's foreman. The tests were successful and received the approval of Chance's construction superintendent. Thereafter the system was drained. There was evidence that the area was not locked, and other workmen, nurses, and even patients were seen there. Sometime in December 1975, the system was put into use, though it had not been accepted by Chance or the owner, nor had it been inspected by the appropriate state agencies.

Three or four days prior to February 7, 1976, Chance's construction superintendent, Ed Stoops, heard air escaping from a sprinkler head and notified Culligan's foreman, Bill Deakins, who, with a workman, Stephen Ray Fuson, proceeded to remedy the problem. They let the air out of the system, then replaced the sprinkler head with a "drop," which is a short length of pipe with a cap or plug on the end of it. The workmen used a 14 to 18 inch pipe wrench to screw the "drop" into the "T" fitting in the pipe that had held the faulty sprinkler head. Thereafter the drop hung down below the ceiling as the sprinkler head had done. This work was accomplished from a ladder below the ceiling, and neither Fuson or Deakins entered the attic, or inspected the "T". Air was then put back into the system, and no further leaks were found. The leaking sprinkler head was found to be bent from some unknown cause, though Fuson speculated that it was bent in shipment or unpacking.

On February 7, 1976, when the area was nearly ready for occupancy, large amounts of water escaped from the system through the broken "T" fitting where the damaged sprinkler had been replaced three or four days earlier. The damage from that water is the subject of this litigation. Upon investigation Culligan's foreman, Bill Deakins, found the "drop" on the hall floor directly below the "T" fitting from which it had hung. The "T", broken into two halves, was found in the attic. The system had tripped, and water had escaped through the broken "T". Deakins opined to Ed Stoops that the fitting was defective, as evidenced by the way it broke.

The "T" was cast iron, and no definite reason for its breaking was ever found. Opinions and speculation abound. Ed Stoops stated that he had seen "T"s broken but it required a sledge hammer blow. Bill Deakins testified that he examined the whole system and could find no cause for the break, but guessed that the "T" was defective. He stated that in 21 years of experience he had never seen a "T" fail in that manner. He speculated that a freeze could do it, but, again, there was no water in the pipes. He further testified that the threads in a pipe are tapered, and a cast iron fitting such as a "T" can be broken by tightening it too tight. However, he described an experiment with an identical "T" in which he was unable to break the "T" with a 24" pipe wrench. Fuson testified that had the "T" broken during the installation of the drop, he could have heard it, but he did not hear it break. In any case if the pressure dropped for any reason, including the compressor being shut off or a leaking pipe, the system could be tripped, causing the release of the water.

An expert witness called by Culligan, Nick F. Bratkovich, an engineer, testified that after metallurgical analysis, no defects could be detected in the broken "T", and further, there was no evidence of abuse of the "T". He stated that a fracture such as this usually occurs at maximum stress. The kinds of forces which would cause the stress are high internal pressure, great impact, or shock. An example would be a hard blow with a hammer along the pipe assembly which could cause a heavy shock load to the casting. Freezing can be a cause. Strong pulsating forces, such as those that occur when water tries to stabilize in a system that has air in it, create impulses through the pipe which can cause a fracture. This latter phenomena is called "water knock" or "water hammer." An external blow, or a blow to the pipe (the "drop") hanging down through the ceiling could also cause a fracture.

ISSUES

Bituminous and Chance raise the following issues for review:

I. Did the trial court commit reversible error when it failed and refused to further instruct or reinstruct the jury, after the jury, during its deliberations made the following request for information: "If you find for the plaintiff on only one of the three counts, is the decision (or verdict) then for the plaintiff or against the plaintiff?

II. Was Bituminous entitled to submit this action to the jury under the doctrine of *res ipsa loquitur*, and if so did the trial court err in its removal of this issue from the jury's consideration and its refusal to instruct upon said doctrine?

III. Did the trial court err in determining as a matter of law that the contract between Culligan and Don Chance violated the provisions of IND.CODE 26–2–5–1 (1976) and in further instructing the jury that a portion of the contract was void?

IV. Was there sufficient evidence upon which to instruct the jury on the issue of contributory negligence?

V. Did the trial court err in instructing the jury concerning the nature and effect of expert testimony?

VI. Did the trial court err in dismissing this action as to Don Chance, or alternatively err in holding that Bituminous was not allowed to recover any damages in this action beyond the actual payment made by Bituminous for damages to the property in question?

## DISCUSSION AND DECISION

*Issue I. Supplemental instruction*

During its deliberation, the jury sent a note to the trial judge with the following question:

"If you find for the plaintiff on only one of the 3 counts, is the decision (or verdict) then for the plaintiff or against the plaintiff."

Upon notification of counsel, the trial court stated that he was not going to respond to the note, absent an agreement. There being no agreement, Bituminous urged the trial court to give a further instruction or reread all of the final instructions, but the trial court refused. Bituminous contends this action was error. Bituminous cites Ind. Code 34–1–21–6, enacted in 1881, and claims that it is controlling.

"After the jury have retired for deliberation, if there is a disagreement between them as to any part of the testimony, or if they desire to be informed as to any point of law arising in the case, they may request the officer to conduct them into court, where the information required shall be given in the presence of, or after notice to, the parties or their attorneys."

The jury had been previously instructed by the trial court's final instruction No. 5 as follows:

"If you find from a consideration of all the evidence that the propositions as to one or more counts have been proved, then your verdict should be for the plaintiff and against the defendant as to each count in which all the requisite propositions were proved. However, if you find from a consideration of all the evidence that any of the propositions for a count have not been proved, then your verdict should be for the defendant as to such count."

█ Failure to answer a jury's question during deliberation is not error per se, and the trial court must exercise discretion in determining whether certain questions of the jury should be answered. *Smith v. State*, (1979) Ind., 388 N.E.2d 484. While a court must, upon request of the jury, read to them properly admitted testimony or documentary evidence, *Ortiz v. State*, (1976) 265 Ind. 549, 356 N.E.2d 1188, in this case the jury's inquiry did not involve testimony, but a question of law.

Our Supreme Court has disapproved of giving *any single* instruction after the jury has commenced deliberation, and their ruling was not limited to "Allen charges." The court, however, approved rereading all

of the instructions previously given. *Crowdus v. State*, (1982) Ind., 431 N.E.2d 796; *Burnett v. State*, (1981) Ind., 426 N.E.2d 1314; *Lewis v. State*, (1981) Ind., 424 N.E.2d 107. Even rereading all of the instructions previously given appears to be discretionary with the trial court. Bituminous cites no authority which gives a litigant the right to have all the instructions reread on its motion.

In the light of all the circumstances, the instruction No. 5 previously given and the fact that the jury did not request rereading of all the instructions, we are of the opinion that the trial court did not abuse its discretion in not responding to the question, or in refusing to reread all the instructions.

*Issue II. Res ipsa loquitur*

Bituminous predicates error in the trial court's action of withdrawing the issue of *res ipsa loquitur* from the jury. Counsel for both sides indicate that the court's action was based upon the court's opinion that the evidence failed to show that the instrumentality was in the exclusive control of Culligan at the time of the injury, a necessary element of *res ipsa loquitur*. Argument and discussion here are limited to that proposition.

Generally stated, *res ipsa loquitur* is a rule of evidence recognized in Indiana. Under the doctrine an inference of negligence can be drawn from certain facts. The doctrine can be invoked where the injuring instrumentality is shown to have been under the exclusive management and control of the defendant or his servants and the accident is one which in the ordinary course of things does not happen if those who control the instrumentality use proper care. *New York, Chicago and St. Louis Railroad Company v. Henderson*, (1957) 237 Ind. 456, 146 N.E.2d 531. Once a plaintiff has presented sufficient evidence to bring himself within the operation of the doctrine, the burden of going forward with evidence to explain the accident is cast upon the defendant, but the burden of proof does not shift. *Snow v. Cannelton Sewer Pipe Company*, (1965) 138 Ind.App. 119, 210 N.E.2d 118. However, even though the defendant comes forward with an explanation of the accident, the inference of negligence does not disappear from the case, but remains and is placed upon the scales to be weighed by the trier of facts with any and all explanations and other evidence. *Merriman v. Kraft*, (1969) 253 Ind. 58, 249 N.E.2d 485; *Henderson, supra.*

In Indiana the cases are clear that to invoke the doctrine of *res ipsa loquitur*, exclusive management and control, or the right and duty to control, of the injuring instrumentality must be in the defendant at the time of injury. *Merriman, supra; Evansville American Legion Home Association v. White*, (1958) 239 Ind. 138, 154 N.E.2d 109; *Henderson, supra; Indiana Harbor Belt Railroad Company v. Jones*, (1942) 220 Ind. 139, 41 N.E.2d 361; *Prest-O-Lite Company v. Skeel*, (1914) 182 Ind. 593, 106 N.E. 365; *Smith v. Insurance Company of North America*, (1980) Ind.App., 411 N.E.2d 638; *The Phoenix of Hartford Insurance Companies v. League, Inc.*, (1973) 155 Ind.App. 342, 293 N.E.2d 58; *Henley v. Nu-Gas Co., Inc.*, (1971) 149 Ind.App. 307, 271 N.E.2d 741; *Deming Hotel Company v. Prox*, (1968) 142 Ind.App. 603, 236 N.E.2d 613; *Snow, supra; Baker v. Coca Cola Bottling Works*, (1961) 132 Ind.App. 390, 177 N.E.2d 759; *The Pittsburgh, Cincinnati, Chicago and St. Louis Railway v. Hoffman*, (1914) 57 Ind.App. 431, 107 N.E. 315. However, authority exists that it is sufficient to prove that the instrumentality causing the injury was in the possession and control of the defendant at the time the negligent act was committed, together with further proof of the absence of any cause intervening between the negligent act and the injury. *Baker, supra* ; Prosser, Law of Torts, 4th Ed. § 39, p. 221. Further authority exists that a plaintiff need not exclude all possibilities other than the defendant's negligence. *Merriman, supra.*

Bituminous cites 65A C.J.S. *Negligence* § 220.15 at page 574.

"The general rule that the exclusive control and management of the appliance

or thing causing the injury must be shown to have been in defendant is not applicable in all circumstances and is subject to exceptions where the purpose of the doctrine of res ipsa loquitur would otherwise be defeated. So it has been held that the matter of control is only one of the numerous factors to be considered in determining whether or not the doctrine is applicable to a particular accident, and that control by defendant is no longer an absolute requirement provided that the other factors usually required are present, chiefly absence of knowledge on the part of the injured party concerning the cause of the incident and superior ability of defendant to explain the occurrence. It has also been held that where a defendant does not have exclusive control of an instrumentality which causes injury, but plaintiff reasonably eliminates other causes than defendant's negligence, exclusive control in defendant is not necessarily a prerequisite to application of the doctrine." (Footnotes omitted.)

Bituminous also cites cases from other jurisdictions which state the same rule given in C.J.S. Even those cases stated:

"'Important though in actions of this class is that the plaintiff prove freedom of fault on the part of all through whose hands the instrumentality passed after it left the defendant.'"

*Saunders v. Walker*, (1956) 229 La. 426, 435, 86 So.2d 89.

We do not perceive that the Indiana cases go so far as Bituminous argues. It is helpful to examine the cases that relate to control. First we shall examine cases in which the court found insufficient or non-exclusive control of the instrumentality by the defendant.

In *Prest-O-Lite, supra*, an employee of an independent contractor was injured when a building under construction collapsed. After his successful suit against the owner, the Indiana Supreme Court reversed, holding res ipsa loquitur inapplicable for the reason that exclusive control of the construction project was not in the owner, but the contractor.

In *Indiana Harbor Belt, supra*, the court held res ipsa loquitur inapplicable because of lack of control by the defendant Railroad. In that case a child was killed while playing in an empty freight car; a heavy door came unlatched and fell on him. The freight car was sitting on a siding available to many people.

In the case of *Evansville American Legion Home, supra*, the plaintiff was injured when a metal folding chair collapsed as she sat down on it at a bingo game hosted by defendant. An examination of the chair, fabricated with rivets and welding, disclosed recently sheared rivets as the cause of the collapse. Experts testified that this type of chair would withstand the impact or shock load of 500 pounds before breaking and would hold 250 pounds safely, far more that the plaintiff's 170 pounds. The Indiana Supreme Court held res ipsa loquitur inapplicable because, among other things, the chair was not in the exclusive control of the Legion at the time of the injury, but was in the control of the plaintiff. Further, the failure of the chair occurred in open view of the plaintiff and other witnesses. No complicated machinery was involved, and the instrumentality was not hidden from the view of the plaintiff. Citing *Henderson, supra*, the court, at 239 Ind. 140, 154 N.E.2d 109, said:

"The doctrine of *res ipsa loquitur* is based to a large extent upon the ground that the evidence or facts concerning the operation of the injuring agency are within the special knowledge and control of the defendant and the injured party does not have free access to such information."

(Henderson involved an enclosed automatic signal control device that malfunctioned at a railroad crossing.)

In *Baker, supra*, the court held that the necessary exclusive control was lacking. A bottle of Coca Cola, which had been delivered to the retail store by the defendant and sold by the retail store, exploded while being carried home by the customer-plaintiff.

*Deming Hotel Company, supra,* is a case analogous to the one at bar. In that case the injury grew out of work performed by a subcontractor, but occurred after the owner was in possession. There the subcontractor installed a mirror in Deming's hotel dining room under contract with a general contractor who was renovating the hotel dining room. The contractor and subcontractor had completed their contracts and the dining room was being operated by Deming when the mirror fell on a customer, causing injury. In a suit against Deming the court held that *res ipsa loquitur* was applicable because Deming was in exclusive control of the dining room. Although the question was not directly in issue, the court necessarily decided that the contractor and subcontractor, who had finished and left the job, were not in control.

In *Henley, supra,* the defendant's workmen serviced the plaintiff's water heater; they entered an outside, unlocked door to reach the heater compartment of plaintiff's house trailer. Three hours later the trailer was discovered aflame. The fire was in the area of the water heater and an adjacent bedroom which contained a fuse box. The court held *res ipsa loquitur* was not applicable because the water heater was not in the exclusive control of the defendant; at the time of the fire it was actually in control of the plaintiff. Further, the water heater compartment was so located that it could have been entered at random by anyone.

The following are cases which have found that the defendant was in exclusive control. In *Southern Indiana Gas and Electric Company v. Indiana Insurance Company,* (1978) Ind.App., 383 N.E.2d 387, after stating that it is sufficient that the defendant had the right or power of control and the opportunity to exercise it, Prosser, Law of Torts, 4th Ed. § 39 p. 220, the court held that a gas line buried under the street was in the control of the defendant. In *Artificial Ice and Cold Storage Company v. Waltz,* (1925) 86 Ind.App. 534, 146 N.E. 826, the court held that an elevator in defendant's store, operated by defendant's servant, which injured plaintiff, a workman, was sufficiently under defendant's control to permit the plaintiff to invoke *res ipsa loquitur.* In another case the court found that the defendants controlled a wall in a burned-out building which they owned; the wall had fallen, causing injury. *Wass v. Suter,* (1949) 119 Ind.App. 655, 84 N.E.2d 734. Likewise, control was found in a plumber who used a torch in an empty apartment building where a fire was discovered a short time after he left. *Phoenix of Hartford, supra.* Where the injuring instrumentality, a broken tile, was still in defendant's truck at the time of the injury, control was sufficiently established. *Snow, supra.*

A survey of the authorities on *res ipsa loquitur* indicates that it is a premise of that doctrine that when the defendant is in control, reason permits the inference that it must have been the defendant who was negligent because fault reasonably cannot be traced to any other person. The doctrine is a product of inductive reasoning. Therefore where there is joint or multiple control of the injuring instrumentality, such logical elimination is not possible. *See Merriman, supra; Union Traction Company of Indiana v. Mann,* (1919) 72 Ind.App. 50, 124 N.E. 510. As stated in Prosser, Law of Torts, 4th Ed. § 39, pp. 218–219:

"... the plaintiff has the burden of proof by a preponderance of the evidence; and in any case where it is clear that it is at least equally probable that the negligence was that of another, the court must direct the jury that the plaintiff has not proved his case. The injury must either be traced to a specific instrumentality or cause for which the defendant was responsible, or it must be shown that he was responsible for all reasonably probable causes to which the accident could be attributed. Accordingly res ipsa loquitur is held not to apply where a chair is thrown from an unidentified window in the defendant's hotel, or where the presence of such an object as a bolt on a railway platform might easily have been due to the act of a third party, or where gas or water or electricity escape from fixtures controlled in part by another.

Where such other causes are in the first instance equally probable, there must be evidence which will permit the jury to eliminate them." (Footnotes omitted.)

■ Here, there is nothing but speculation as to what caused the "T" to break. Witnesses delineated a number of possibilities such as hammer blows, water knock, freezing, defective fitting, tightening the pipe too tight, shutting off the compressor and letting the pressure down thus tripping the system, a hammer blow along the pipe assembly, and striking the "drop" which hung down into the hallway. None of these causes did the witnesses describe as probable. Other workmen worked in and about the system while it was being installed and afterward. The area was available to other people as well. When the break occurred, the system was operational and under the control of Chance and/or the owner. We agree with the trial court that *res ipsa loquitur* is not applicable because exclusive control of the instrumentality by Culligan was not demonstrated.

*Issue III. Breach of contract*

■ Count I of Bituminous' complaint proceeds on the theory of breach of contract. The subcontract between Chance and Culligan contained the following provision:

"NINTH. The Sub-contractor agrees to indemnify and save harmless the Owner and General Contractor against loss or expense by reason of the liability imposed by law upon the Owner or General Contractor for damage because of bodily injuries, including death at any time resulting therefrom; accidentally sustained by any person or persons or on account of damage to property arising out of or on account of or in consequence of the performance of this contract, whether or not such injuries to persons or damage to the property are due or claimed to be due to any negligence of the Sub-contractor, his employees, his agents or servants."

In its answer to Count I, Culligan invoked Ind.Code 26–2–5–1 (1976) which was in effect at all times relevant and reads as follows:

"All provisions, clauses, covenants, or agreements contained in, collateral to, or affecting any construction or design contract except those pertaining to highway contracts, which purport to indemnify the promissee against liability for:

(1) death or bodily injury to persons;

(2) injury to property;

(3) design defects; or

(4) any other loss, damage or expense arising under either (1), (2) or (3);

from the sole negligence or willful misconduct of the promisee or the promisee's agents, servants or independent contractors who are directly responsible to the promisee, are against public policy and are void and unenforceable."

Culligan contends that paragraph "Ninth" of the construction contract was void as an indemnity agreement which purported to indemnify Chance against liability for his sole negligence. At the close of all the evidence the trial court granted in part Culligan's motion for judgment on the evidence as to Count I because ". . . paragraph Ninth is void under the statute," and withdrew that issue from the jury. Error is assigned for the court's action in that regard.

Our examination of the record of the trial does not indicate that Bituminous proceeded on any theory that the damage was caused by any negligence of Chance, nor was there any such evidence. However, any interpretation of the evidence discloses that the damage was caused by the unexplained breaking of a "T" fitting installed by Culligan.

Prior to the enactment of Ind.Code 26–2–5–1 in 1975, a number of Indiana cases addressed the problem of a contract for indemnity of one's own negligence. Contracts which provided indemnification for one's own negligence could, if knowingly and willingly made, be valid and enforceable in Indiana. *State of Indiana, Indiana State Highway Commission v. Thomas*, (1976) 169 Ind.App. 13, 346 N.E.2d 252;

*Loper v. Standard Oil Company*, (1965) 138 Ind.App. 84, 211 N.E.2d 797. However, such provisions were strictly construed and were not held to provide indemnity unless so expressed in clear and unequivocal terms. *Norkus v. General Motors Corporation* (S.D. Ind.1963) 218 F.Supp. 398; *Indiana Highway, supra.* It has been said in reference to the clear and unequivocal test, that "[a]s a general rule, it is not required that there be an express reference to the negligence of the indemnitee." *Norkus, supra* at 399; *General Accident and Fire Assurance Corporation v. The New Era Corporation,* (1966) 138 Ind.App. 349, 354, 213 N.E.2d 329. However, in *Indiana State Highway, supra,* Judge Sullivan convincingly demonstrated that it is "difficult to envision an indemnity provision . . . in terms which are 'clear and unequivocal', which does *not* contain an express stipulation as to indemnity against the indemnitee's own negligence." *Id.* 169 Ind.App. at 27, 346 N.E.2d 252. He concluded, after a searching analysis which we need not repeat, that "explicit reference to the indemnitee's negligence is a prerequisite to his indemnification therefor." *Id.,* 169 Ind.App. at 28, 346 N.E.2d 252. The operative words of the indemnity clause in *Indiana State Highway, supra,* were

> " 'The contractor shall indemnify and save harmless the State . . . from all . . . claims of any character brought on account of any injuries . . . sustained by any persons . . . from neglect in safeguarding the work . . . or because of any act or omission, neglect or misconduct of said Contractor . . . or for any claim . . . under the "Workmen's Compensation Law"[.]' " (Emphasis omitted.)

*Id.,* 169 Ind.App. at 25, 346 N.E.2d 252. The court concluded that this language did not clearly express an intent to indemnify the State against its own negligence.

The following are other examples of indemnity clauses which Indiana courts have held not to provide indemnity for an indemnitee's own negligence under the above analysis. In *State v. Thompson,* (1979) Ind. App., 385 N.E.2d 198, the clause reads:

> "(n) the permittee . . . shall assume all responsibility for any injury or damage to persons or property resulting directly or indirectly from the construction of any approach or driveway."

*Id.,* 385 N.E.2d at 217. The court, following *Indiana State Highway, supra,* held as a matter of law that no indemnity existed for the indemnitee's own negligence.

In *Vernon Fire and Casualty Insurance Company v. Graham,* (1975) 166 Ind.App. 509, 336 N.E.2d 829, the operative words of the indemnity clause were as follows:

> "The Lessee agrees to be responsible for any damage to the property . . . which may result from any use of the demised premises, or any act done thereon by the Lessee . . . and will also save the Lessor harmless from any liability to any other person, for damage to person or property resulting from any such causes."

*Id.,* 166 Ind.App. at 512, 336 N.E.2d 829. After quoting the general rules above, the court held that this clause was not sufficiently clear and unequivocal to provide for indemnification against the Lessor's own negligence.

In *New Era Corporation, supra,* the essential language of the clause read:

> " ' . . . It is understood that Vendor . . . agrees to protect and indemnify The Austin Company against all claims . . . which may arise in connection with the fulfillment of this Purchase Order.' "

*Id.* at 350, 213 N.E.2d 329. The court recited the rules above, held the problem was one of interpretation, and found that the clause did not provide for indemnity against the indemnitee's own negligence.

In *General Telephone Co. of Indiana v. Penn Central Co.,* (1971) 149 Ind.App. 50, 270 N.E.2d 337, the operational words were:

> " 'SIXTH: Second Party [Telephone] shall and will at all times hereafter indemnify and save harmless First Party [Railroad] from and against any and all detriment . . . claims . . . which First Party may suffer . . . by reason of the location, construction, maintenance, use or presence of said WORK . . . .' " (Footnote omitted.)

*Id.* at 51, 270 N.E.2d 337. The court noted that the clause contained no express promise by the indemnitor to indemnify the indemnitee for its own negligence. Following the holding of *New Era Corporation, supra,* the court held that such indemnity for the First Party's own negligence did not exist:

> "Such indemnity is not expressly provided and there is nothing in the language of the agreement to support a finding that such indemnification was intended by the parties."

*General Telephone, supra,* at 52, 270 N.E.2d 337.

Culligan attempts to refute the Indiana authorities by citing a case from another jurisdiction. *Bland v. L'Enfant Plaza North, Inc.,* (1972) 154 App.D.C. 26, 473 F.2d 156, which reached a conclusion contrary to that of the Indiana court. We are constrained to follow Indiana authorities. Culligan also cites *Center Township of Porter County v. City of Valparaiso,* (1981) Ind. App., 420 N.E.2d 1272, which does not aid it. That case reiterated the above authorities, but held that the language of the clause in question specifically provided for indemnity to the city for its own negligence.

Examination of paragraph "Ninth" reveals no specific language which could be characterized as a clear and unequivocal indemnity to Chance for its own negligence, nor was there any express reference to the negligence of Chance. In effect, clause "Ninth" was no different from the clauses in the cases cited which held no such indemnity to exist. Therefore it cannot be construed to be an agreement for indemnification of Chance's sole negligence, and it is not void under Ind.Code 26–2–5–1. The statute having no applicability, the court erred in withdrawing Count I for breach of contract from the jury.

## Issue IV. Contributory negligence

■ Bituminous contends that the trial court committed error in instructing the jury on the issue of contributory negligence when there was no evidence on that issue. Bituminous correctly asserts that the giving of a contributory negligence instruction in the absence of any evidence thereon constitutes error. *Pardue v. Seven-Up Bottling Co. of Indiana,* (1980) Ind.App., 407 N.E.2d 1154. However it is not reversible error where the plaintiff introduces no evidence of negligence on the part of the defendant, because even under proper instructions, the judgment on the negligence count could be no different. *Pardue, supra.* We have already discussed the absence of sufficient evidence justifying the application of *res ipsa loquitur.* Bituminous does not contend in its discussion of *Pardue* that there was any other specific evidence of negligence on the part of Culligan, and our search of the record does not reveal any. Hence, any judgment on a negligence theory could not stand. We find no reversible error here.

## Issue V. Expert opinion instruction

The trial court gave its instruction No. 3 relative to the consideration of the testimony of an expert witness. It commenced, "In this case expert opinion testimony has been introduced." No mention was made of any witness. Bituminous claims that the objectionable instruction categorizes certain testimony as expert testimony, thus giving it undue prominence and weight. We need not determine whether the instruction was erroneous. The expert testimony related only to the negligence and breach of warranty counts. The negligence count was unsupported, and the warranty count is not part of this appeal. As in *Pardue, supra.*

> "... regardless of those instructions, no judgment for the Pardues on their negligence theory could stand because of a total absence of any showing of negligence on the part of Seven-Up."

407 N.E.2d 1157. Insomuch as we have determined that any judgment on a negligence theory cannot stand because of the lack of proof of specific acts of negligence by Bituminous, and the inapplicability of *res ipsa loquitur,* we hold that the error, if any, in giving this instruction was harmless.

## Issue VI. Punitive damages, attorney fees and incidental expenses

Under this issue it is argued by Bituminous and Chance that if Bituminous was

not allowed to recover all or part of the damages (we assume they mean incidental expenses, attorney fees, and punitive damages) then upon intervention, Chance was so entitled. Their argument states:

"Frankly, both Bituminous and Don Chance can accept the correctness of this ruling, however, if such is the case, such ruling cannot be reconciled with the subsequent rulings of the court which denied Bituminous the right to recover any damages beyond Bituminous' payment for damages to the property. If the assignment was only to the extent of said amount ... then, in that event, Don Chance remained the real party in interest for the purpose of recovering incidental damages including attorney fees and punitive damages."

■ The "proof of loss" form from which Bituminous' claim is derived states, "... the assured does hereby subrogate to the insurer ...." The right of subrogation is one of indemnity only, and the insurer is not entitled to recover a greater amount than it has paid to its assured. *Smith v. Wells*, (1919) 72 Ind.App. 29, 122 N.E. 334; *Gieseke v. Johnson*, (1888) 115 Ind. 308, 17 N.E. 573. Bituminous has cited no authority to support its argument that it was entitled to recover more than it paid Chance.

■ Furthermore we note that neither Chance nor Bituminous had a cause of action for attorney fees, incidental expenses, or punitive damages. Relative to the claim for attorney fees and incidental expenses, we note generally that expenses of litigation and attorney fees may not be included in damages unless they are provided for by some prior contract or statute. *Cooper v. High*, (1974) 262 Ind. 405, 317 N.E.2d 177; *Perry County Council v. State ex rel. Baertich*, (1973) 157 Ind.App. 586, 301 N.E.2d 219. Again no citation is offered to inform us of either authority or facts to bring Bituminous or Chance within the rule.

■ Relative to the claim for punitive damages, we observe that in contract actions punitive damages are not recoverable for breach unless (1) the breach includes conduct which independently establishes the elements of a common law tort such as fraud, or (2) elements of fraud, malice, gross negligence, or oppression mingle in the controversy, and the public interest will be served by the deterrent effect of the punitive damage award. *Hoosier Insurance Company v. Mangino*, (1981) Ind.App., 419 N.E.2d 978. We further stated in *Mangino* that a promisor cannot be subjected to punitive damages merely because he makes a good faith, but unsuccessful, defense. In tort actions punitive damages may be awarded only where there is a showing of fraud, malice, or oppressive conduct. *See Jeffersonville Silgas, Inc. v. Wilson*, (1972) 154 Ind.App. 398, 290 N.E.2d 113; *Indiana & Michigan Electric Company v. Stevenson*, (1977) 173 Ind.App. 329, 363 N.E.2d 1254; 9 I.L.E. *Damages* § 110. In the case at bar there has been no showing of circumstances or allegations, and no citation of authorities which would entitle Bituminous or Chance to any punitive damages. There is further authority that a subrogee has no standing to sue for punitive damages, but can only recover what is paid. 73 Am.Jur.2d *Subrogation* § 115.

Finally, we note that all Chance's dealings were with Bituminous. Chance made no effort to collect money from Culligan which would generate claims for attorney fees, incidental expenses, or punitive damages. If Bituminous was reluctant to pay the claim, such obstinate behavior cannot be attributed to Culligan in a claim for punitive damages or expenses. We find no error in the trial court's action in this regard.

For the above reasons, this cause is affirmed as to all issues except Issue III. This cause is reversed as to Issue III, and the court is ordered to grant a new trial on Count I of Bituminous' complaint.

Affirmed in part; reversed in part with instructions.

RATLIFF, P. J., and ROBERTSON, J., concur.