**Sandra GOLD as Administrator of the Estate of Margaret Frostick, Deceased, Appellant–Plaintiff,**

**v.**

**Badr A. ISHAK, M.D., Board of Trustees of Porter Memorial Hospital and Thomas Kalmbach, M.D., Appellee–Defendant.**

No. 64A05–9809–CV–479.

Court of Appeals of Indiana.

Dec. 15, 1999.

William H. Tobin, Benjamen W. Murphy, Ruman Clements Tobin & Holub, Hammond, Indiana, Attorneys for Appellant.

David C. Jensen, Alyssa Stamatakos, Eichhorn & Eichhorn, Hammond, Indiana, Attorneys for Appellee Badr A. Ishak, M.D.

Robert J. Palmer, W. Todd Woelfer, May Oberfell & Lorber, South Bend, Indiana, Attorneys for Appellee for Thomas Kalmbach, M.D.

Kathleen M. Maicher, Robert D. Brown, Merrillville, Indiana, Attorneys for Appellee Porter Memorial Hospital.

## OPINION

SHARPNACK, Chief Judge

Sandra Gold[1] appeals the trial court's grant of a motion for judgment on the evidence in favor of Badr A. Ishak, M.D., Board of Trustees of Porter Memorial Hospital and Thomas Kalmbach, M.D. (collectively "Medical Providers"). Gold raises three issues which we consolidate and restate as whether the trial court erred in refusing to apply the doctrine of res ipsa loquitur and in granting the Medical Providers' motion for judgment on the evidence. We reverse and remand.

In addition, the Medical Providers raise one issue on cross-appeal which we restate as whether the trial court erred in failing to grant summary judgment in their favor. We affirm.

The relevant facts follow. On January 23, 1995, seventy-eight year old Margaret Frostick was admitted to Porter Memorial Hospital. Following an evaluation of Frostick and her medical tests, she was scheduled to have a right carotid endarterectomy.[2]

Dr. Kalmbach ordered monitored anesthesia care, a type of anesthesia commonly referred to as a "mac" be used in the procedure. The "mac" keeps a patient in a sedated state but still allows the patient to be responsive, so that her vital signs can be closely watched and oxygen can be administered. The "mac" method was chosen because Frostick was susceptible to certain complications due to having multi-

---

1. Gold is the administrator of the estate and daughter of Margaret Frostick who was the plaintiff patient in this case until her death on July 12, 1998.

2. A right carotid endarterectomy is a procedure that is performed on the patient's right carotid artery which is on the right side of the face and neck. During the surgery the patient's head is turned to the left side to expose the right side of the neck.

ple systematic diseases, including diabetes and coronary artery disease. Supplemental oxygen was given to Frostick through a mask in order to prevent complications. The oxygen mask that was used came in only one size, and therefore did not provide an airtight seal.

In performing the carotid endarterectomy, Dr. Kalmbach used an electrocautery unit [3] provided by Porter Memorial Hospital. The electrocautery unit sat on a rolling cart that was about three feet high and measured about a foot and a half wide and a foot deep. A cord runs from the machine to a device that looks like a pencil that emits sparks which the doctor uses to cauterize blood vessels on the patient. There is also another cord that attaches to a grounding pad so the current can be dispersed through the patient to make the circuit complete during the procedure.

Frostick's surgery was performed on January 24, 1995. During the surgery, Dr. Kalmbach, Dr. Ishak, Dr. Joseph Venditti, Jr.[4] and Porter Memorial Hospital employees Grace Dytrt, a nurse, and Barbara Fugate, a surgical technologist, were present. Dr. Kalmbach was standing on Frostick's right side and Fugate was on Frostick's left side. Dr. Ishak was standing at the head of the bed and Dytrt was at the foot of the bed.

The following events occurred in the operating room. The circulating nurse, who was employed by Porter Memorial Hospital, used a skin preparation on Frostick called PhisoHex. Dr. Kalmbach placed towels on Frostick's face, and then, with the assistance of a circulating nurse, placed drapes around her that separated the electrocautery unit from the oxygen mask. The drapes were placed in such a manner that Dr. Kalmbach could not see Frostick's face or the oxygen mask from where he stood during the surgery. Dr. Ishak, the anesthesiologist, who was sit-

ting at the head of the table, was the only person that could see Frostick's face.

During the procedure, a "popping" sound came from the electrocautery unit used by Dr. Kalmbach. Record, p. 360. Dr. Venditti then checked the settings on the unit. Dr. Kalmbach continued the procedure because everything appeared fine. A second "popping" sound was heard and Frostick began squirming under the towels and became very agitated. Record, p. 360. Fugate testified that she saw an unusually large spark. At that point, Dr. Ishak, Dr. Venditti and Fugate realized that the oxygen mask was on fire. Dr. Ishak or Dr. Venditti removed the burning mask from Frostick's face. Although the mask was in flames, the drapes were not burned. It is undisputed that the only thing that caught on fire was the oxygen mask. Frostick's face and chest were burned as a result of the fire.

Frostick presented a claim of negligent treatment to a medical review panel who concluded on August 26, 1996, that the Medical Providers had complied with the requisite standards of care in treating Frostick. On October 24, 1996, Frostick filed a complaint against the Medical Providers for medical malpractice. The Medical Providers all moved for summary judgment. The trial court denied the Medical Providers' motion for summary judgment, concluding that Frostick did not need to present direct evidence of a breach of the standard of care under the res ipsa loquitur doctrine and that the common knowledge exception applied, thus obviating the requirement for expert testimony on that subject. The Medical Providers moved to reconsider the denial of the motion for summary judgment, and the trial court denied that motion as well.

The trial commenced in August of 1998. At the close of Frostick's case the Medical Providers moved for judgment on the evi-

---

3. The electrocautery unit is also referred to as a "bovie." Record, p. 208.

4. Dr. Venditti is not a party to this case. However, he was the assistant surgeon for Frostick's procedure.

dence. They asserted that Gold had failed to present direct evidence of a breach of the standard of care and that the doctrine of res ipsa loquitur and the "common knowledge" exception did not apply. Gold argued that this issue had been decided at the summary judgment stage and that the facts presented at trial were no different than the facts presented for the summary judgment motions. Nonetheless, the trial court granted the Medical Providers' motion for judgment on the evidence.

## I.

■ The first issue is whether the trial court erred in not applying the doctrine of res ipsa loquitur and in granting the Medical Providers' motion for judgment on the evidence. Indiana Trial Rule 50 governs judgment on the evidence. It provides in relevant part:

> "Where all or some of the issues in the case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon notwithstanding the verdict."

Ind. Trial Rule 50(A). Upon review of a motion for judgment on the evidence, we consider the evidence most favorable to the nonmoving party along with all reasonable inferences to be drawn therefrom. *Weinberg v. Geary*, 686 N.E.2d 1298, 1301 (Ind.Ct.App.1997), *reh'g denied, trans. denied*. Judgment on the evidence should be denied unless there is a total absence of evidence or reasonable inference on at least one essential element of a plaintiff's case. *Id.* at 1301–1302. As long as there is probative evidence or a reasonable inference to be drawn from the evidence presented or if reasonable people would differ as to the result, judgment on the evidence is improper. *Id.* at 1302. A motion for judgment on the evidence should be granted only in those cases where the evidence does not conflict, is susceptible to only one

inference, and supports judgment for the movant. *Id.*

■ Medical malpractice actions are similar to other negligence actions. *Slease v. Hughbanks*, 684 N.E.2d 496, 498 (Ind. Ct.App.1997). Generally, the mere fact that an injury occurred will not give rise to a presumption of negligence. *Baker v. Coca Cola Bottling Works*, 132 Ind.App. 390, 394, 177 N.E.2d 759, 762 (1961). The plaintiff must prove that the defendant owed him a duty and that the defendant breached that duty, which proximately caused an injury to the plaintiff. *Slease*, 684 N.E.2d at 498. Physicians are not held to a duty of perfect care. *Id.* Instead, the doctor must exercise the degree of skill and care ordinarily possessed and exercised by a reasonably skillful and careful practitioner under same or similar circumstances. *Id.* at 498–499. To establish the applicable standard of care and to show a breach of that standard, a plaintiff generally must present expert testimony. *Id.* at 499. Because medicine is an inexact science, an inference of negligence usually will not arise simply because there is a bad result without proof of some negligent act. *Carpenter v. Campbell*, 149 Ind.App. 189, 194, 271 N.E.2d 163, 166 (1971). To hold otherwise would require physicians to insure rapid and proper recovery by their patients from any and all surgical and postoperative treatment. *Id.* However, the doctrine of res ipsa loquitur is a qualified exception to the general rule that the mere fact of injury will not create an inference of negligence. *Baker*, 132 Ind.App. at 394, 177 N.E.2d at 762.

■ Res ipsa loquitur literally means "the thing speaks for itself." *Id.* at 394, 177 N.E.2d at 761. Consequently, the facts or circumstances accompanying an injury may be such as to raise a presumption, or at least permit an inference, of negligence on the part of the defendant. *Id.*, 177 N.E.2d at 761. The doctrine of res ipsa loquitur is a rule of evidence which allows an inference of negligence to be drawn from certain surrounding facts.

*Vogler v. Dominguez,* 624 N.E.2d 56, 61 (Ind.Ct.App.1993), *reh'g denied, trans. denied.* Application of the doctrine does not in any way depend on the standard of care imposed by law but, rather, *depends entirely upon the nature of the occurrence out of which the injury arose. Id.* Whether the doctrine applies in any given negligence case is a mixed question of law and fact. *Id.* The question of law is whether the plaintiff's evidence included all the underlying elements of res ipsa loquitur. *Shull v. B.F. Goodrich Co.,* 477 N.E.2d 924, 928 (Ind.Ct.App.1985) *reh'g denied, trans. denied.* We have previously held that

> "[u]nder the doctrine of res ipsa loquitur, negligence may be inferred where [1] the injuring instrumentality is shown to be under the management or exclusive control of the defendant or his servants *and* [2] the accident is such as in the ordinary course of things does not happen if those who have management of the injuring instrumentality use proper care."

*Vogler,* 624 N.E.2d at 61 (emphasis added). A plaintiff relying upon res ipsa loquitur may show that the event or occurrence was more probably the result of negligence by *relying upon common sense and experience or by expert testimony. Id.* The plaintiff's burden in this regard is to produce a reasonable showing that the injury was indeed one which would not ordinarily occur in the absence of proper care on the part of those who manage or maintain the instrumentality. *Id.*

### A.

We first look to whether Gold has shown that the injuring instrumentality was under the management or exclusive control of the Medical Providers. *See Vogler,* 624 N.E.2d at 61. The element of "exclusive control" is a broad concept which focuses upon who has the right or power of control and the opportunity to exercise it, rather than actual physical control. *Id.* Exclusive control is satisfied if the defendant had control at the time of the alleged negligence. *Id.* at 61–62. Exclusive control may be shared control if multiple defendants each have a nondelegable duty to use due care. *Id.* at 62. In proving the element of exclusive control, the plaintiff is not required to eliminate with certainty all other possible causes and inferences, but must show either that the injury can be traced to a specific instrumentality or cause for which the defendant was responsible, or that the defendant was responsible for all reasonably probable causes to which the accident could be attributed. *Id.* The reason for this is because proof in a res ipsa loquitur case seldom points to a single specific act or omission; typically, it points to several alternative explanations involving negligence without indicating which of them is more probable than the other. *Id.* Hence, a plaintiff may offer such evidence as may be available tending to show specifically the items of negligence and still rely upon the inference permitted under res ipsa loquitur. *Id.*

Here, Dr. Kalmbach placed towels on Frostick's face, and then, with the assistance of a circulating nurse, placed drapes around her. During the surgery, Dr. Kalmbach used an electrocautery unit that was supplied by Porter Memorial Hospital and Dr. Ishak controlled the oxygen mask. A nurse and surgical technologist employed by the Hospital were also present during the surgery. Dr. Kalmbach and Dr. Ishak admitted that the source of ignition for the fire must have been the electrocautery unit. Dr. Kalmbach testified that the oxygen mask may have become displaced enough to break the seal while Dr. Ishak testified that the mask did not produce an air-tight seal, therefore oxygen could escape. There is no evidence that anyone else participated in the procedure or made use of the electrocautery unit, the drapes, or the mask. Therefore, Gold has presented evidence that the electrocautery unit and the oxygen mask were the injuring instrumentalities and were under the

exclusive control of the Medical Providers. *See Vogler,* 624 N.E.2d at 61.

### B.

■ Next, we look to whether a fire under these circumstances is such that in the ordinary course of things it would not happen if the Medical Providers used proper care in relation to the electrocautery unit and oxygen mask. *See Vogler,* 624 N.E.2d at 61. Here, the doctors used an electrocautery unit near an oxygen source, creating a risk of fire. The risk of fire here was especially great because the type of oxygen mask used did not produce an air tight seal. Therefore, during this procedure drapes were used to separate the electrocautery unit from the oxygen. Although Dr. Kalmbach claims that the electrocautery unit did not come any closer than the operative area which was four inches from the oxygen mask, neither Dr. Ishak or Dr. Kalmbach can explain how the elements combined here to cause the fire.

Gold's expert, Dr. Stephen Lalka,[5] testified that he has performed the carotid endarterectomy procedure over 400 times. Although Dr. Lalka testified that the use of the electrocautery unit combined with the use of supplemental oxygen does not itself fall below the standard of care, he stated that he had never heard of a fire resulting from the procedure and asserted that it was not an expected result. Dr. Lalka opined that although the records did not show what went wrong, something clearly did. Dr. Lalka also stated that the fire was extremely unusual. Accordingly, Gold has presented evidence that a fire does not ordinarily happen during a carotid endarterectomy if those who have control of the electrocautery unit and oxygen mask use proper care. *See Vogler,* 624 N.E.2d at 61.

Gold has presented evidence that the electrocautery unit and oxygen mask were under the exclusive control of the Medical Providers and that the fire was such that the ordinary course of things would not happen if those who used these devices exercised proper care. *See id.* The conditions surrounding the surgery have met the underlying elements of the doctrine of res ipsa loquitur, and therefore, the inference of negligence is applicable. *See Shull,* 477 N.E.2d at 928. Consequently, the trial court erred in not applying res ipsa loquitur.

The Medical Providers present several arguments to support their claim that the doctrine of res ipsa loquitur should not be applied to this case because Frostick did not present sufficient evidence to establish that the fire was most probably the result of negligence. First, the Medical Providers argue that Frostick's own expert testified that there were several possible causes for the fire and that none of them were a result of negligence or a breach of the standard of care.

■ Under the doctrine of res ipsa loquitur it is not necessary for a plaintiff to exclude every other possibility other than the defendant's negligence as a cause for the plaintiff's injury. *Merriman v. Kraft,* 253 Ind. 58, 63, 249 N.E.2d 485, 487 (Ind. 1969). Once a plaintiff has presented sufficient evidence to bring himself within the operation of the doctrine, the burden of going forward with the evidence to explain the accident is cast upon the defendant. *Hammond v. Scot Lad Foods, Inc.,* 436 N.E.2d 362, 364 (Ind.Ct.App.1982) However, even though the defendant comes forward with an explanation of the accident and evidence of his careful inspection, tests, and due care, the inference of negligence drawn from the facts does not disappear from the case, but instead remains, and is placed upon the scales to be weighed by the trier of fact along with any

---

**5.** Dr. Lalka is a peripheral vascular surgeon who is a Professor or Surgery at Indiana University Medical Center.

and all explanations of the defendant, as well as all of the other evidence. *Id.*

▮ Here, the Medical Providers argue that the PhisoHex skin preparation or hair on Frostick's face could have caused the fire. Consequently, they argue that the fire could have occurred without any negligence on their part. On cross-examination, Dr. Lalka opined that it was possible that no medical provider breached the standard of care. He testified that, based upon the records prepared by the defendants, it was *possible* that the medical providers properly draped Frostick. Dr. Lalka espoused his two "best guess theor[ies]" for what could have happened, based upon all the records being complete and accurate. Record, p. 342. Those were that it was possible that either facial hair or PhisoHex could have been the fuel for the fire which was ignited by the electrocautery unit. However, it is not necessary for Gold to exclude every other possibility other than the Medical Providers' negligence as a cause. *See Merriman,* 253 Ind. at 63, 249 N.E.2d at 487. We conclude that although the Medical Providers have come forward with an explanation of the accident and evidence of due care, the inference of negligence drawn from the facts does not disappear from the case, but instead remains, and should be placed upon the scales to be weighed by the trier of facts along with all of the other evidence. *See Hammond,* 436 N.E.2d at 364.

▮ Next, the Medical Providers argue that the jury should not be allowed to exercise its common knowledge to decide this case. Therefore, they conclude there is no evidence that Frostick's injury was probably the result of negligence. However, we have held that res ipsa loquitur can be proven through expert testimony or common knowledge. *Vogler,* 624 N.E.2d

at 61. In this case there was evidence provided by expert testimony to support the inference of negligence. Therefore, we need not address the Medical Providers argument against the use of common knowledge, but will do so because this issue may arise on remand.

▮ The Medical Providers assert that the common knowledge exception does not apply here because the carotid endarterectomy was a complicated medical procedure. Ordinarily the standard of care that is required of a doctor may not be resolved without resort to expert testimony. *Stumph v. Foster,* 524 N.E.2d 812, 815 (Ind.Ct.App.1988) *reh'g denied.* However, expert testimony is required only when the issue of care is beyond the realm of the lay person. *Id.* The standard of care need not be established by expert opinion when the doctor's conduct was understandable by the jury without extensive technical input. *Id.*

Here, Frostick's face and shoulder were burned as a result of a fire that started during her surgery for a right carotid endarterectomy. Common sense tells us that injury to the patient from a fire in the operating room is not a frequent or expected outcome of surgery. In performing the carotid endarterectomy, Dr. Kalmbach used an oxygen mask which did not provide an airtight seal in conjunction with an electrocautery unit which emitted sparks. The Doctors recognize, as do we, that the use of the electrocautery unit near an oxygen source creates a risk of fire.

Therefore, we conclude that expert testimony is not required because a fire occurring during surgery where an instrument that emits a spark is used near a source of oxygen is not beyond the realm of the lay person to understand.[6] *See Stumph,* 524

---

**6.** Medical Providers argue that *Slease* controls the outcome of this case. However, the *Slease* court relied upon the fact that the plaintiff was unable to point to an instrument in the control of the defendants which was the probable cause of his burn. *Slease,* 684

N.E.2d at 499, 500. There was no evidence of a fire in *Slease.* In deciding whether expert testimony was required we stated that "the true question is whether the burn was caused by an instrument or technique used during the surgery and whether the instru-

N.E.2d at 815. While mere use of the electrocautery unit combined with the use of supplemental oxygen may not itself fall below the standard of care, it is easily understandable to the common person that careless use of the two could cause a fire and result in bodily injury. Moreover, the doctor's conduct was understandable by the jury without extensive technical input. *See Stumph*, 524 N.E.2d at 815, 816 (holding res ipsa loquitur applicable thus raising an inference of negligence because a rational trier of fact could infer that a careful chiropractor would not have broken the plaintiff's rib while manipulating her spine); *Burke v. Capello*, 520 N.E.2d 439, 441 (Ind.1988) (holding that expert testimony was not required where a doctor used liquid cement in a wound during surgery because a rational trier of fact could have inferred from the admissible evidence that the cement would have been in at least a hardening state and thus perceptible by sight or touch to a careful observer engaged in the process of cleansing the wound of debris, instruments, and other paraphernalia), *overruled on other grounds by, Vergara by Vergara v. Doan*, 593 N.E.2d 185, 186 (Ind.1992).

■■■ The Medical Providers argue that the common knowledge exception only applies where foreign objects have been left in a patient's body. Among other cases, they rely upon *Weinberg*, 686 N.E.2d at 1302. In *Weinberg*, we stated that "a plaintiff is not required to present expert testimony in cases where a deviation from the standard of care is a matter within the common understanding of lay persons and the deficiency of the physician's conduct 'speaks for itself'" *Id.* They rely on our statement that "'common knowledge' or res ipsa loquitur exception, has been narrowly construed to apply only in cases of 'obvious' malpractice and, thus, has *typically* been limited to cases involving the

failure of an operating physician to remove some surgical implement or other foreign object from the patient's body." *Id.* (emphasis added). Although we have typically limited the use of common knowledge to cases involving the physician's failure to remove an object, that does not preclude the use of the res ipsa loquitur or common knowledge exception in other cases, such as this one. *See id.*

Finally, the Medical Providers assert that the focus should be on their actions, not the ultimate result. For this assertion, they rely upon our statement in *Whyde v. Czarkowski* that common knowledge applies when

"'the complained-of conduct is so obviously substandard that one need not possess medical expertise in order to recognize the breach. It is otherwise when the question involves the delicate inter-relationship between a particular medical procedure and the causative effect of that procedure upon a given patient's structure, endurance, biological makeup, and pathology. The sophisticated subtleties of the latter question are not susceptible to resolution by resort to mere common knowledge.'"

*Whyde v. Czarkowski*, 659 N.E.2d 625, 628 (Ind.Ct.App.1995), *trans. denied* (quoting *Malooley v. McIntyre*, 597 N.E.2d 314, 319. (Ind.Ct.App.1992)). Here, we are looking at whether negligence can be inferred from a fire resulting where oxygen and a spark were used in close proximity during surgery, not the effect of the right carotid endarterectomy on Frostick's subsequent health. *See Whyde*, 659 N.E.2d at 628. Therefore, there are no "sophisticated subtleties" to this question which would require expert testimony. *See id.*

The evidence presented at trial clearly shows that Gold has established the elements necessary for the inference of res ipsa loquitur. *See Vogler*, 624 N.E.2d at

ment or technique was misused or whether burns are a common and expected result." *Id.* at 499. Frostick's situation is easily distinguishable because there is abundant evidence that the electrocautery unit was the instrumentality that caused the fire that resulted in her injury.

61. Consequently, the trial court erred in granting the Medical Providers' motion for judgment on the evidence. *See Weinberg,* 686 N.E.2d at 1302.

For the forgoing reasons, we reverse the trial court's grant of the Medical Providers' motion for judgment on the evidence and remand the case to the trial court for a new trial. Reversed.

## II.

We now address the Medical Providers' claim on cross appeal. That is, whether the trial court erred in failing to grant summary judgment in their favor. The evidence before the trial court at the time of the Medical Providers' motion for summary judgment was for all intents and purposes the same as that before the trial court when it granted their motion for judgment on the evidence, with the exception of Dr. Lalka's testimony that something might be missing from the records. Having concluded that there was sufficient evidence from which a jury could conclude the Medical Providers were negligent, we necessarily conclude that the evidence at the summary judgment stage was sufficient to create a genuine issue of material fact as to the negligence of the Medical Providers. *See Scott v. Bodor, Inc.,* 571 N.E.2d 313, 318 (Ind.Ct.App.1991). Therefore, the trial court did not err in denying the Medical Provider's motion for summary judgment. *See id.*

For the forgoing reasons, we affirm the trial court's denial of the motion for summary judgment.

Affirmed.

MATTINGLY, J., and BAKER, J. concur.