SHAMBAUGH & SON, INC., an Indiana corporation for profit; Koorsen Protective Service, Inc., an Indiana corporation for profit, Appellants–Defendants Below,

and

Abell Elevator International, Inc., a Kentucky corporation for profit, Defendant Below,[1]

v.

David L. CARLISLE and Mary L. Carlisle, Appellees–Plaintiffs Below.

No. 02A03–9908–CV–325.

Court of Appeals of Indiana.

June 27, 2000.

---

**1.** Abell Elevator International, Inc. is a nominal party to this appeal. Ind. Appellate Rule 2(B).

Dane L. Tubergen, Hunt Suedhoff, LLP, Fort Wayne, Indiana, Attorney for Appellant Koorsen Protective Service, Inc.

Steven J. Moss, Johnson Smith Pence & Heath LLP, Indianapolis, Indiana, Attorney for Appellant Shambaugh & Son, Inc.

C. Richard Marshall, Columbus, Indiana, Daniel A. Roby, Roby & Hood, Fort Wayne, Indiana, Attorneys for Appellees.

**OPINION**

SULLIVAN, Judge

Appellants, Shambaugh & Son, Inc. (Shambaugh) and Koorsen Protective Service, Inc. (Koorsen) appeal the trial court's denial of summary judgment.

We reverse.

The relevant facts reveal that on October 27, 1994, David Carlisle (Carlisle) was injured while he was a passenger in an elevator located in a building on the Indiana University–Purdue University at Indianapolis campus. Carlisle and another passenger were in the basement of the building where there are two elevators side by side. They entered the elevator on the left, but its doors did not close and the elevator did not move. Carlisle and the other passenger then exited that elevator and waited for the elevator on the right to arrive. After the elevator arrived, they entered and proceeded up to the first floor where the other passenger obtained a beverage from a machine for Carlisle while he held the elevator, and after others boarded the elevator, they continued toward their destination on the third floor of the building.

The elevator, however, abruptly changed direction between the first and second floors, and returned to the basement. When the elevator changed direction, the shift caused Carlisle, who was in a wheelchair, to lift from the chair. As he fell back to the chair, his walking cane which he kept by his side in the chair rolled under him. Carlisle was injured when he landed upon the cane. When the elevator arrived at the basement, its doors opened partially and then slammed shut. The elevator then rose to the second floor where its doors properly opened and Carlisle and the other passenger exited. It was later learned that a fire alarm signal had been received by the elevator at the time Carlisle was a passenger in the elevator.

The elevator in which Carlisle was injured was installed by Abell Elevator In-

ternational, Inc. (Abell). Shambaugh installed the electrical wiring for the building in which the elevator was located, and Koorsen was Shambaugh's subcontractor who connected the fire alarm system to the electrical wiring. When an elevator receives a fire alarm signal, the National Safety Code for Elevators and Escalators requires that the elevator go into "fire service mode." Record at 52. The elevator must go to a designated floor and remain at that floor with its doors open until normal operations are resumed. If an elevator is moving in the opposite direction from the designated floor, it stops and changes direction. If the signal is coming from the designated floor, then the elevator proceeds to an alternative floor.

Carlisle filed a complaint against Abell, Shambaugh, and Koorsen based upon negligence and specifically relying upon the theory of *res ipsa loquitur* to prove it, alleging injuries as a result of the elevator reversing direction. Carlisle claims that the fire alarm system sent a false signal to the elevator causing it to move into "fire mode." In this case, the upwardly moving elevator abruptly changed direction when it received the signal resulting in his injury. Carlisle asserted that the false signal from the fire alarm system was caused by the installation of low and high voltage electrical wiring adjacent to each other in the same conduit. Shambaugh and Koorsen both moved for summary judgment. Abell did not submit a motion for summary judgment. The trial court denied Shambaugh and Koorsen's motions for summary judgment.

Upon appeal, appellants, noting that Carlisle's negligence claim is based upon *res ipsa loquitur*, contend that Carlisle failed to establish the necessary requirements for application of the doctrine and that, therefore, they are entitled to summary judgment. Appellants also assert that as a matter of law, no act of either of them, proximately caused Carlisle's injuries.

■ *Res ipsa loquitur* is a rule of evidence which permits an inference of negligence to be drawn based upon the surrounding facts and circumstances of the injury. *K–Mart Corp. v. Gipson* (1990) Ind.App., 563 N.E.2d 667, 669, *trans. denied*. The doctrine "literally means 'the thing speaks for itself.'" *Gold v. Ishak* (1999) Ind.App., 720 N.E.2d 1175, 1180. To infer a defendant's negligence, the plaintiff must establish "1) that the injuring instrumentality was within the exclusive management and control of the defendant or its servants; and, 2) the accident is of the type that does not ordinarily happen if those who have the management and control exercise proper care." *K–Mart, supra* at 669. In determining if the doctrine is applicable, the question is whether the incident more probably resulted from defendant's negligence as opposed to another cause. *Id.* A plaintiff may rely upon common sense and experience or expert testimony to prove that the incident more probably resulted from negligence. *Gold, supra* at 1181.

■ To invoke *res ipsa loquitur,* the plaintiff must demonstrate that the defendant had exclusive control of the injuring instrumentality at the time of injury. *Bituminous Fire & Marine Ins. Co. v. Culligan Fyrprotexion, Inc.* (1982) Ind.App., 437 N.E.2d 1360, 1365. Even if the defendant was not in control of the causative instrumentality at the exact moment of injury, he still may be considered to have exclusive control so long as the defendant was the last person in control of the instrumentality. *Shull v. B.F. Goodrich Co.* (1985) Ind.App., 477 N.E.2d 924, 931, *trans. denied.* Exclusive control is a concept which focuses upon who has the right or power of control and the opportunity to exercise it. Exclusive control is more expansive than actual physical dominion. *Newell v. Westinghouse Elec. Corp.* (1994) 7th Cir., 36 F.3d 576, 580. The existence of multiple defendants or the possibility of multiple causes does not automatically defeat the application of *res ipsa loquitur.*

*Vogler v. Dominguez* (1993) Ind.App., 624 N.E.2d 56, 62, *trans. denied.*

■ In the instant case, Carlisle asserts that the appellants had exclusive control and management over the instrumentality, and absent appellants' negligence, this accident would not have occurred. Carlisle, recognizing that a theory of *res ipsa loquitur* may be maintained with multiple defendants and causes, concludes through the use of experts that the defective wiring caused the false fire alarm signal which the elevator received. This reception of the false signal caused the elevator to shift direction, injuring Carlisle. Carlisle contends that the appellants had exclusive control because they installed and maintained the wiring and fire alarm system which malfunctioned. Appellants counter, that as a matter of law, they did not have control over the instrumentality.

Here, the injuring instrumentality is the elevator, not the electrical wiring or the fire alarm system. The discussion with respect to the applicability of *res ipsa loquitur*, therefore, must focus upon the elevator's movements. Whether there was a false fire alarm signal or a real fire alarm signal conveyed to the elevator is irrelevant. The elevator should act in the same way regardless of whether the signal was triggered by a real alarm or a false one. Carlisle confirmed that the elevator on the left would not move from the basement. This is the proper procedure for elevators during a fire alarm. The elevator on the right also proceeded to the basement, which was in accord with the fire service mode. However, when Carlisle and the other passenger boarded the elevator, it did not remain "frozen" in fire service mode. The elevator left fire service mode, and proceeded to the upper floors. Any malfunction of the elevator which changed its direction in the midst of its upward procession was not related to the fire alarm signal, which had been sent earlier as evidenced by the left-side elevator's "frozen" mode and the arrival of the right-side elevator to the basement. Even if the right-side elevator had a delayed reaction to the fire alarm signal, the elevator shifted direction and headed downward. If this is the case, the elevator did not malfunction at all, other than the delayed reaction to the fire alarm signal. If the elevator shifted direction too rapidly, any injury caused by that shift has nothing to do with any action of the appellants in this case.

Given these circumstances, it is impossible to conclude that either appellant had exclusive control over the elevator at the time Carlisle was injured. Even considering that exclusive control is an expansive concept which contemplates more than actual physical control, the appellants in this case had nothing to do with installing or maintaining the elevator itself. Moreover, any defect in electrical wiring or the fire alarm system for which the appellants were responsible is irrelevant to the elevator and its movements after the signal had been received. If the elevator did not stay at the designated floor during fire service mode, then that failure would seem to be related to those in control of the elevator, not those in charge of installing the electrical wiring or fire alarm system. Similarly, if the elevator did not receive the fire alarm signal for some unknown reason until it was in mid-flight with Carlisle and others, then a malfunction did not take place. The elevator, as it was supposed to do, shifted direction and headed to the basement which was the designated floor. When arriving at the basement, it likely sensed a safety concern and proceeded to an alternative floor. The appellants did not have any control over the elevator during this course of events either.

Although the exact reason for the movements of the elevator is not explained with certainty, the course of events indicates that neither Koorsen nor Shambaugh was involved. While *res ipsa loquitur* is a doctrine allowing the inference of negligence when events are unexplained or the cause of injury is not narrowed to one specific act, the purposes of the doctrine

would not be served by keeping the appellants involved in this litigation when it is impossible to conclude that either of them controlled or managed the injuring instrumentality.

Therefore, Carlisle, as a matter of law, may not rely upon *res ipsa loquitur* to prove his negligence claim against Koorsen and Shambaugh. Because Carlisle has failed to state a negligence claim outside of *res ipsa loquitur,* the trial court erred in denying Koorsen and Shambaugh's motions for summary judgment.

The judgment is reversed with instructions for the trial court to enter summary judgment in favor of the appellants.

BAKER, J., and DARDEN, J., concur.