

FILED

Dec 31 2018, 8:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Brian J. Hurley
Timothy C. Krsak
Douglas Koeppen & Hurley
Valparaiso, Indiana

ATTORNEYS FOR APPELLEE:
VISHNUVARDHAN RAO, D.O.

Karl L. Mulvaney
Nana Quay-Smith
Margaret M. Christensen
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

Louis William Voelker
Eichhorn & Eichhorn LLP
Hammond, Indiana


ATTORNEYS FOR APPELLEES:
PORTER HOSPITAL AND
PORTER HOSPITAL PHARMACY

Sharon L. Stanzione
Alan M. Kus
Johnson & Bell, P.C.
Crown Point, Indiana


ATTORNEYS FOR APPELLEE:
KEITH ATASSI, M.D.

Michael E. O'Neill
Jeremy W. Willett
Jessica L. Mullen
O'Neill McFadden & Willett LLP
Schererville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Mindy (Engel) Speaks,

*Appellant/Cross-Appellee-Plaintiff,*

v.

Vishnuvardhan Rao, D.O.,
Unity Physicians, Indiana
Physician Services, LLC, Porter
Hospital, Porter Hospital
Pharmacy, and Keith Atassi,
M.D.

*Appellees/Cross-Appellants-Defendants.*

December 31, 2018

Court of Appeals Case No.
18A-CT-131

Appeal from the Porter Superior
Court

The Honorable William E. Alexa,
Senior Judge

The Honorable Thomas Webber,
Senior Judge

The Honorable Jeffrey Clymer,
Judge

Trial Court Cause No.
64D02-1411-CT-10090

**Robb, Judge.**

# Case Summary and Issues

Mindy (Engle) Speaks brings this interlocutory appeal of the trial court's grant of summary judgment in favor of Keith Atassi, M.D. ("Dr. Atassi"); Porter Hospital and Porter Hospital Pharmacy ("Porter Hospital"); and Vishnuvardhan Rao, D.O., Unity Physicians, and Indiana Physician Services, LLC ("Dr. Rao") (collectively, "Defendants") on the issue of medical malpractice. The Defendants cross-appeal the denial of their motion for

summary judgment on the issue of negligence. Concluding summary judgment in favor of the Defendants on the issue of medical malpractice was appropriate but that the Defendants were also entitled to summary judgment on the issue of negligence, we affirm in part, reverse in part, and remand for the entry of summary judgment.

## Facts and Procedural History

On the morning of November 19, 2012, Speaks, a forty-three-year-old registered nurse, was exercising with her daughter when she experienced a "sudden onset of [heart] palpitation[s] with associated shortness of breath and mild chest tightness." Appellant's Appendix, Volume 5 at 73. Speaks went to the emergency room at Porter Hospital in Valparaiso where she was placed under the care of Dr. Rao, a board-certified emergency room physician. Speaks was diagnosed with a condition called wide complex tachycardia, or, more simply, a very rapid heartbeat.

Pursuant to Dr. Rao's orders, nursing staff started an IV to administer medications to slow Speaks' heartbeat. At 9:20 a.m., Dr. Rao ordered, and a nurse administered, six milligrams of Adenosine by an IV "push." A "push" is a large saline bolus which follows the medication to help it move through the IV and into the blood stream and heart. Dr. Rao also ordered two electrocardiogram tests to monitor Speaks' heart function. After the first dose of Adenosine proved ineffective, Dr. Rao ordered a second, higher dose of Adenosine. A nurse administered twelve milligrams by IV push. This too

proved ineffective and Dr. Rao ordered the administration of 150 milligrams of Amiodarone, another medication that treats tachycardia through a different methodology. Sixty-four minutes after entering the emergency room, Speaks' heart rate returned to a stable sinus rhythm as the Amiodarone appeared effective. Dr. Rao ordered Speaks receive 325 milligrams of aspirin and the nurses again carried out the order. In addition to the medications listed above, which are uncontested by the parties, a computerized chart documenting Speaks' vital signs and fluid intake also included a mention of "SOTRADECOL 3%[.]" *Id.* at 74.

[4] At 11:08 a.m., Speaks was discharged from the emergency room and transported to the telemetry floor where she was placed under the care of Dr. Atassi. Speaks' IV site was assessed and it showed no signs of redness, edema, tenderness, or drainage. Dr. Atassi completed a Deep Vein Thrombosis Risk Assessment and Therapy Order ("DVT Risk Form") and scored her at "2" based on the total of "1" for "Age 40-80 years" and "1" for "Overweight (BMI 25-30)[,]" placing her at a "moderate risk[.]" *Id.* at 69. Dr. Atassi ordered a consultation with an electrophysiologist and labs to determine Speaks' Factor V Leiden[1] status, which were collected and sent to Mayo Clinic Laboratories for testing. Thereafter, Dr. Atassi prepared Speaks' discharge summary with a diagnosis of proximal tachycardia, tobacco use disorder, history of transient

---

[1] Factor V Leiden is a genetic mutation of one of the clotting factors in the blood. This mutation can increase a patient's chance of developing abnormal blood clots, most commonly in the legs or lungs.

ischemic attack/stroke without residual effects, long-term use of aspirin, and a family history of blood disorder. The next day, as a nurse removed Speaks' IV in preparation for her release, there appeared a "long stringy clot that had attached itself to the catheter being withdrawn." *Id.* at 77.

[5] After Speaks returned home, she noticed some swelling, redness, and pain in her right arm where the IV had been placed. Five days later, on November 25, Speaks returned to the emergency room and was readmitted to Porter Hospital. Speaks refused the placement of an IV and a venous doppler study revealed that Speaks had a basilic vein DVT, or a blood clot, where her IV had been placed on November 20. Speaks was treated with blood thinners. The next day, Dr. Atassi saw Speaks for a cardiac consultation and again noted her family history of blood disorders. Dr. Atassi had not yet received the results from Speaks' Factor V Leiden test. Speaks was eventually released to return home but her treatment entailed several return visits to the hospital.

[6] On January 15, 2013, Speaks filed a proposed complaint with the Indiana Department of Insurance, and subsequently amended her complaint to include all of the present Defendants. Prior to the ruling by the medical review panel, Speaks filed a complaint in state court on November 18, 2014. Speaks' amended complaint alleged the Defendants had been negligent with respect to Speaks' evaluation and treatment while at Porter Hospital in November 2012. Pursuant to statute, Speaks' amended complaint also revealed the action of the medical review panel. The medical review panel's unanimous opinion was that

the evidence did not support a conclusion that the Defendants failed to meet the applicable standard of care.

[7] Following the Defendants' initial filing of motions for summary judgment, the trial court issued an order granting the Defendants leave to amend their motions to address Speaks' third amended complaint, which had been filed in the interim. The court also granted Speaks until April 11, 2017, to respond to the same. The Defendants' motions highlighted Speaks' lack of expert testimony to contradict the unanimous opinion of the medical review panel. Speaks argued that the common knowledge exception allowed her case to survive summary judgment without such testimony.

[8] The trial court granted partial summary judgment to the Defendants on the issue of medical malpractice on October 10, 2017. However, the trial court interpreted Speaks' third amended complaint to have asserted new claims of medical negligence against the Defendants that were independent of her claims for medical malpractice. In so doing, the trial court found that Speaks' medical negligence claims—which were based on the same facts and circumstances as her medical malpractice claims—did not have to be supported by expert testimony regarding the standard of care and could proceed as claims of ordinary negligence.

[9] Speaks now appeals the trial court's grant of summary judgment on the issue of medical malpractice and the Defendants cross-appeal the trial court's denial of summary judgment on the issue of medical negligence.

# Discussion and Decision

## I. Standard of Review

[10] Summary judgment is a tool which allows a trial court to dispose of cases where only legal issues exist. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). The moving party has the initial burden to show the absence of any genuine issue of material fact as to a determinative issue. *Id*. An issue is "genuine" if a trier of fact is required to resolve the truth of the matter; a fact is "material" if its resolution affects the outcome of the case. *Id*. As opposed to the federal standard which permits the moving party to merely show the party carrying the burden of proof lacks evidence on a necessary element, Indiana law requires the moving party to "affirmatively negate an opponent's claim." *Id*. (quotation omitted). The burden then shifts to the non-moving party to come forward with contrary evidence showing an issue to be determined by the trier of fact. *Id*. Although this contrary evidence may consist of as little as a non-movant's designation of a self-serving affidavit, summary judgment may not be defeated by an affidavit which creates only an issue of law—the non-movant must establish that material *facts* are in dispute. *AM Gen. LLC v. Armour*, 46 N.E.3d 436, 441-42 (Ind. 2015).

[11] We review a summary judgment order with the same standard applied by the trial court. *City of Lawrence Util. Serv. Bd. v. Curry*, 68 N.E.3d 581, 585 (Ind. 2017). Summary judgment is appropriate only when "the designated evidentiary matter shows that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). As our supreme court has cautioned, however, summary judgment is a "blunt instrument" by which the non-prevailing party is prevented from resolving its case at trial and therefore we must carefully "assess the trial court's decision to ensure [a party] was not improperly denied [his or her] day in court." *Hughley*, 15 N.E.3d at 1003-04 (citations omitted). "Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims." *Id*. at 1004.

In medical malpractice cases, a unanimous opinion of the medical review panel that the physician did not breach the applicable standard of care is ordinarily sufficient to establish prima facie evidence negating the existence of a genuine issue of material fact entitling the physician to summary judgment. *Stafford v. Szymanowski*, 31 N.E.3d 959, 961 (Ind. 2015). Thereafter, the burden shifts to the plaintiff, who may rebut with expert testimony. *Id*. "Failure to provide expert testimony will usually subject the plaintiff's claim to summary disposition." *Bhatia v. Kollipara*, 916 N.E.2d 242, 246 (Ind. Ct. App. 2009).

## II. Summary Judgment

### A. Medical Malpractice

Like other negligence actions, a medical malpractice plaintiff must prove that the defendant owed her a duty and that the defendant breached that duty, which proximately caused the plaintiff's injury. *Narducci v. Tedrow*, 736 N.E.2d 1288, 1292 (Ind. Ct. App. 2000). "Physicians are not held to a duty of perfect

care[,]" but a "doctor must exercise the degree of skill and care ordinarily possessed and exercised by a reasonably skillful and careful practitioner under the same or similar circumstances." *Id.* As noted above, expert testimony is generally required to establish the applicable standard of care and to show a breach of that standard. *Id.* "Because medicine is an inexact science, an inference of negligence will not arise simply because there is a bad result without proof of some negligent act." *Id.*

### 1. Sotradecol

[14] First, Speaks claims the trial court erred in granting Dr. Rao and Porter Hospital summary judgment on the issue of medical malpractice because she was given the "wrong drug" while a patient in the emergency room on November 19, 2012.[2] Corrected Appellant's Brief at 16.

[15] The only evidence designated by Speaks on this issue is a computerized chart documenting Speaks' vital signs and fluid intake which included two mentions of "SOTRADECOL 3%[.]" Appellant's App., Vol. 5 at 74. The top half of the chart documents Speaks' temperature, pulse, respirations, blood pressure, pain levels, and oxygen saturation. Speaks' oxygen saturation levels, "O2 SAT %," were recorded as "97%" and "98% Room air[.]" *Id.* The bottom section of the chart includes two separate graphs titled "ALL MEDS[.]" *Id.*

---

[2] Initially, Speaks alleged all of the Defendants were negligent by failing to flush her IV and by failing to take preventative measures to prevent DVT. Since Dr. Rao's motion for summary judgment, however, Speaks has focused exclusively on her contention that she erroneously received Sotradecol while under Dr. Rao's care in the emergency room.

"SOTRADECOL 3%" is listed under both "ALL MEDS" graphs, with the first followed by "98% room" five times, and the second followed by "98% room" twice. *Id.*

[16] The presence of "SOTRADECOL 3%" on Speaks' computerized vital signs and fluid intake chart constitutes an uncontested fact. *Id.* However, Speaks argument also requires "[t]he inference . . . that the drug would have been ordered by Dr. Rao, come from the Porter Pharmacy and been administered by the nursing staff." Corrected Appellant's Br. at 16. Although we are mindful that all reasonable inferences must be construed in favor of the nonmoving party, *AM General LLC*, 46 N.E.3d at 439, those inferences must still be *reasonable. See Fowler v. Campbell*, 612 N.E.2d 596, 602 (Ind. Ct. App. 1993) (explaining that an "unreasonable inference" is an inference which results in action that is arbitrary or capricious and which is based on "speculation, guess, surmise, conjecture or mere possibility").

[17] Here, Sotradecol appears by numbers representing oxygen saturation levels, not a dosage. There is no other record of Dr. Rao having ordered Sotradecol, no record of any nurse having administered Sotradecol, and Sotradecol is conspicuously absent from the other records where the uncontested medications, namely Adenosine, Amiodarone, and Aspirin, are listed. Speaks remembered having received these other medications but has no memory of having received Sotradecol. Further, Dr. Rao testified that he would not have ordered Sotradecol and there were no other doctors who could have ordered the medication. He explained that Sotradecol 3% was "most likely entered in

error[,]" and that, because the chart references seven distinct measurements within a two-hour visit, "[i]f I am following your assertion, this patient received Sotradecol not once, but one, two, three, four, five [times] in rapid succession . . . that is totally illogical, it doesn't make any sense." Appellant's App., Vol. 5 at 36.

[18]    Patricia Keith, the clinical systems analyst for Porter Hospital and a former nurse, testified that this charting anomaly was brought to her attention in April 2013 when the director of the Porter Hospital Pharmacy informed her that Sotradecol was showing up on patient's charts and that "the hospital does not carry Sotradecol." *Id.*, Vol. 6 at 73. Keith further testified that "Sotradecol has never been stocked in our pharmacy or in our Pyxis machines." *Id*. at 72. Keith's job responsibilities included building and supporting screens used for Porter Hospital's clinical charting systems, specifically for the nurses and ancillary charting. Porter Hospital uses the software platform McKesson and after McKesson was alerted to the charting error, it determined that the error occurred due to a "mismatched label sequence between the clinical charting and the emergency room charting systems." *Id*. at 74. When a nurse in the emergency room would chart a patient's oxygen saturation level, therefore, the software generated the name "Sotradecol" in error. *Id*. at 76. Keith further testified that the computerized vital signs and fluid intake chart is not the "correct charting that would appear if a drug were given." *Id*. at 77.

[19]    Speaks refused to have an IV administered when she returned to the hospital on November 25, 2012, for fear of developing another blood clot. Despite the fact

that Sotradecol is a drug administered intravenously, Sotradecol once again appeared on Speaks' computerized vital signs and fluid intake chart next to her oxygen saturation levels. Speaks admitted that this must have been an error, unrelated to the medications or treatment that she received.

[20] In light of the evidence and circumstances presented, we conclude the only reasonable inference is that Sotradecol's presence on Speaks' computerized vital signs and fluid intake chart was a charting error; Sotradecol was not even a drug available at Porter Hospital on November 19, 2012. Therefore, although we agree that whether Speaks received Sotradecol is a "material" fact because it could affect the outcome of her case, we nevertheless conclude that Speaks has failed in her burden to demonstrate that this issue is "genuine." *Hughley,* 15 N.E.3d at 1003 (explaining that an issue is only "genuine" if a trier of fact is required to resolve the truth of the matter). Accordingly, summary judgment in favor of Dr. Rao and Porter Hospital on this issue was appropriate.[3]

---

[3] We disagree with Speaks' contention that the only issue raised by the Defendants on summary judgment was the standard of care. Specifically, Speaks argues, "[s]ince the Defendants failed to present any evidence as to duty, causation, and/or damages those issue [sic] remain unaddressed and the Plaintiff may rest on her complaint and other pleadings." Corrected Appellant's Br. at 20. Whether Speaks received Sotradecol was addressed on reply, *see Spudich v. Northern Ind. Public Serv. Co.,* 745 N.E.2d 281, 285-87 (Ind. Ct. App. 2001) (holding new arguments can be made in a reply brief on summary judgment), *trans. denied,* argued at the summary judgment hearing, and thoroughly litigated on appeal.

The trial court granted summary judgment to Dr. Rao and Porter Hospital on this issue by concluding Speaks had failed to proffer expert testimony contradicting the medical review panel. Appealed Order at 5. It is well established, however, that we may affirm the trial court's grant of summary judgment upon any basis supported by the record. *Kumar v. Bay Bridge, LLC*, 903 N.E.2d 114, 115 (Ind. Ct. App. 2009).

## 2. DVT Risk Form

Next, Speaks claims the trial court erred in granting Dr. Atassi and Porter Hospital summary judgment on the issue of medical malpractice relating to the completion of her DVT Risk Form. Specifically, Speaks claims that she does not need an expert opinion to refute a unanimous medical review panel because of the "common knowledge" exception.[4] Corrected Appellant's Br. at 25.

A plaintiff is not required to present expert testimony in cases where deviation from the standard of care is a matter commonly known to lay persons. *Perry v. Driehorst*, 808 N.E.2d 765, 768 (Ind. Ct. App. 2004), *trans. denied*. This "common knowledge" exception applies where:

> the complained-of conduct is so obviously substandard that one need not possess medical expertise in order to recognize the breach. It is otherwise when the question involves the delicate inter-relationship between a particular medical procedure and the causative effect of that procedure upon a given patient's structure, endurance, biological makeup, and pathology. The sophisticated subtleties of the latter question are not susceptible to resolution by resort to mere common knowledge.

*Malooley v. McIntyre*, 597 N.E.2d 314, 319 (Ind. Ct. App. 1992).

---

[4] Speaks further argues that "[r]es ipsa loquitur may be, but is not necessarily, an element of the use of the 'common knowledge' exception to the need for expert testimony." Corrected Appellant's Br. at 25. However, Speaks never advances an argument regarding res ipsa loquitur and this issue is waived for our review. *See, e.g.*, *D.H. by A.M.J. v. Whipple*, 103 N.E.3d 1119, 1126 (Ind. Ct. App. 2018), *trans. denied*.

[23]     The common knowledge exception typically arises in instances such as physicians leaving foreign objects in a patient's body, because a jury does not require expert testimony that the object should have been removed. *See Balfour v. Kimberly Home Health Care, Inc.*, 830 N.E.2d 145 (Ind. Ct. App. 2005). We have also permitted the common knowledge exception to be applied where physicians were using an instrument near a source of oxygen and a fire occurred during a surgery, *Gold v. Ishak*, 720 N.E.2d 1175 (Ind. Ct. App. 1999), *trans. denied*, or where a chiropractor broke a patient's ribs during treatment for migraine headaches, *Stumph v. Foster*, 524 N.E.2d 812 (Ind. Ct. App. 1988).

[24]     Here, the record reveals Dr. Atassi completed a DVT Risk Form which omitted Speaks' "characteristic of coagulapathy [sic], a blood disorder that is Factor V Leiden[,] tobacco use disorder (risk factor), stroke at the age of 25 (a risk factor) and family history of a blood disorders [sic] (another risk factor)." Corrected Appellant's Br. at 11. Had the form been properly completed, Speaks argues, "the score should have shown very high risk of DVT. Instead, due to the mistakes by Dr. Atassi, [Speaks'] score, despite her Factor V Leiden a clotting disorder, only revealed a moderate threat."[5] *Id*. at 27.

---

[5] Speaks makes several references to her Factor V Leiden diagnosis as a fact Dr. Attassi would have, or should have, been aware of on the date he completed the DVT Risk Form. However, the record reveals that Dr. Attassi ordered the Factor V Leiden test on November 19, 2012, and he did not receive the results of that test until November 28, 2012, nine days later, and three days after Speaks' second admission to Porter Hospital. *See* Appellant's App., Vol. 6 at 37.

The thrust of Speaks' argument is that the DVT Risk Form is a "simple form with simple instructions." *Id*. at 28. Therefore, according to Speaks, the common knowledge exception should be applied because a jury would not need expert testimony to understand Dr. Atassi's breach. As we explained in *Malooney*, however, the common knowledge exception is inapplicable "when the question involves the delicate inter-relationship between a particular medical procedure and the causative effect of that procedure upon a given patient's structure, endurance, biological makeup, and pathology." 597 N.E.2d at 319. That is the case presented here. Although a sophisticated lay person's completion of the form is within the realm of possibility, the relevant inquiry is whether a lay person could *understand* the form's *medical significance*. We therefore agree with the trial court's conclusion that this was a complex medical issue "not susceptible to resolution by resort to common knowledge[.]" Appealed Order at 6. And we conclude the trial court properly granted summary judgment in favor of Dr. Atassi and Porter Hospital because Speaks failed to bring forth expert testimony contradicting a unanimous medical review panel.

### 3. IV Flushing

Speaks also claims her testimony precluded summary judgment in favor of Porter Hospital relating to the monitoring and flushing of her IV. Porter Hospital, in turn, argues that Speaks' assertions are factually inaccurate, that Speaks relies on evidence not in the record, and that even if Speaks' allegations were true, Speaks has once again failed to present expert testimony

contradicting a unanimous medical review panel. We agree with Porter Hospital.

[27] Citing to her affidavit for evidentiary support, Speaks argues that she "offered uncontested testimony that, in violation of common flushing protocols, her intravenous line was never flushed for the entire time she was at the hospital." Corrected Appellant's Br. at 23.[6] However, Speaks' affidavit is no longer evidence in the record because the trial court granted Porter Hospital's motion to strike this affidavit, providing:

> It is, therefore, considered, ordered, adjudged, and decreed by the Court, that the Defendants' Motion for Summary Judgment *and Motion to Strike is granted* in part as it relates to the medical malpractice portion of the complaint, however, it is denied as to the complained reference to medical negligence and injuries alleged to have resulted from such negligence . . . .

Appealed Order at 9 (emphasis added). Speaks did not file a response to Porter Hospital's motion to strike Speaks' affidavit and, with the exception of limited argument in Speaks' reply brief to Porter Hospital, Speaks has not challenged the trial court's decision on appeal. Because Speaks raised this issue for the first time in a reply brief on appeal, Speaks' challenge to the granting of the motion to strike her affidavit is waived for our review. *See Curtis v. State,* 948 N.E.2d

---

[6] Speaks further contends this allegation is "corroborated by the relevant medical records which likewise contained no indication that the plaintiff received appropriate flushing protocol with respect to her [IV]." *Id.* at 23. To the contrary, the record reflects Speaks' IV was checked on at least four occasions and her IV was flushed at 11:17 a.m. Appellant's App., Vol. 6 at 49.

1143, 1148 (Ind. 2011) (noting that parties may not raise an issue for the first time in a reply brief on appeal).

[28] As Speaks' argument regarding expert testimony relies exclusively upon an affidavit stricken from evidence, we conclude Speaks has failed to present expert testimony in order to contradict a unanimous medical review panel.[7] Therefore, summary judgment on this issue was appropriate.

## B. Negligence

[29] The trial court concluded that although Speaks' lack of expert testimony entitled the Defendants to summary judgment on her claim of medical malpractice, that had "no merit in [Speaks'] claim for negligence." Appealed Order at 7. The court then ordered that the Defendants' motions for summary judgment were:

> [G]ranted in part as it relates to the medical malpractice portion of the complaint, however, it is denied as to the complained reference to medical negligence and injuries alleged to have resulted from such negligence . . . .

*Id.* at 9. On cross-appeal, the Defendants argue the trial court erred in denying their motion for summary judgment by sua sponte creating a distinction

---

[7] Speaks also utilizes a subheading reading "Common Knowledge exception to expert witness evidence as to failure to flush lines or engage in DVT prophylaxis." Corrected Appellant's Br. at 25. Speaks then discusses Dr. Atassi's failure to complete the DVT Risk Form discussed above without advancing an argument regarding the common knowledge exception applied to IV flushing. Therefore, Speaks has also waived this argument for our review. *Whipple*, 103 N.E.3d at 1126.

between Speaks' claims of "medical negligence" and "medical malpractice." We agree.

[30] To the extent that the trial court separates Speaks' claim of "medical malpractice" from her claim of "medical negligence," we emphasize that Indiana law does not recognize such a distinction. These terms are one in the same and our courts use these terms interchangeably for claims more properly referred to as medical malpractice—namely, those claims falling under the provisions of the Indiana Medical Malpractice Act. *See, e.g., Howard Reg'l Health Sys. v. Gordon*, 952 N.E.2d 182 (Ind. 2011) (using the terms "medical malpractice" and "medical negligence" interchangeably throughout). In the context of the trial court's discussion, however, it appears the trial court sought to distinguish Speaks' claim of medical malpractice (or medical negligence) and a claim of *ordinary* negligence.

[31] The Indiana Medical Malpractice Act ("MMA") covers "curative or salutary conduct of a health care provider acting within his or her professional capacity, but not conduct *unrelated* to the promotion of a patient's health or provider's exercise of professional expertise, skill, or judgment." *Id.* at 185. (emphasis added) (citation and quotations omitted). It is uncontested that Speaks was a patient of the Defendants and the Defendants are qualified healthcare providers covered by the Act. However, the MMA is not all-inclusive as to claims against medical providers, and a claim against a medical provider sounding in ordinary negligence or premises liability rather than medical malpractice falls outside the

procedural and substantive provisions of the MMA. *Peters v. Cummins Mental Health, Inc.*, 790 N.E.2d 572, 576 (Ind. Ct. App. 2003), *trans. denied*.

[32] The "fact that the alleged misconduct occurs in a healthcare facility" or that "the injured party was a patient at the facility," is not dispositive in determining whether the claim sounds in medical malpractice. *Madison Ctr., Inc. v. R.R.K.*, 853 N.E.2d 1286, 1288 (Ind. Ct. App. 2006), *trans. denied.* Rather, the test to determine whether a claim sounds in medical malpractice is whether the claim is based on the provider's behavior or practices while acting in his professional capacity as a provider of medical services. *Collins v. Thakkar,* 552 N.E.2d 507, 510 (Ind. Ct. App. 1990), *trans. denied*. By contrast, a case sounds in ordinary negligence when the factual issues are capable of resolution without application of the health care provider's standard of care. *Terry v. Cmty. Health Network, Inc.*, 17 N.E.3d 389, 393 (Ind. Ct. App. 2014). "[W]e are guided by the substance of a claim to determine the applicability of the Act." *Id.*

[33] In response to Dr. Rao's motion for summary judgment, the trial court found "the complained-of conduct of Dr. Rao is not susceptible to resolution by resort to mere common knowledge," and, in regard to Dr. Atassi and Porter Hospital, found "[t]his case involves complex medical issues, which are not susceptible to resolution by resort to mere common knowledge, therefore falling within the greater realm of medical malpractice cases, which require an expert opinion." Appealed Order at 5-6. It is perplexing then, that the trial court simultaneously concluded—on the very same facts—that Speaks had presented a claim of ordinary negligence.

[34] We conclude that Speaks' claims present a straightforward application of the MMA. Speaks (1) was admitted to the emergency room where she claims to have received the wrong medication from Dr. Rao and Porter Hospital staff; (2) was transported to the telemetry floor and placed under the care of Dr. Atassi where she claimed Dr. Atassi incorrectly completed a DVT Risk Form; and (3) throughout her admission at Porter Hospital, Speaks claims that her IV was not properly monitored or flushed. These claims boil down to a "question of whether a given course of treatment was medically proper and within the appropriate standard[,]" which is the "quintessence of a malpractice case." *Howard Reg'l Health Sys.*, 952 N.E.2d at 185. Therefore, Speaks' claims sounded in malpractice, not ordinary negligence, and the trial court erred in denying the Defendants' motion for summary judgment.

# Conclusion

[35] For the reasons set forth above, we conclude the Defendants were entitled to summary judgment on the issues of medical malpractice *and* negligence. Therefore, we affirm in part, reverse in part, and remand for the entry of summary judgment on Speaks' negligence claims.

[36] Affirmed in part, reversed in part, and remanded with instructions.

Baker, J., and May, J., concur.